## CHARAVAY & BODVIN v. YORK SILK MFG. CO.

### (Circuit Court, S. D. New York. March, 1909.)

CARRIERS (§ 51*)—SALES (§ 455*)—CONDITIONAL SALES—DISTINGUISHED FROM OTHER TRANSACTIONS—BILLS OF LADING—CONSTRUCTION.

A bank which advances money or credit for the purchase of goods for import, taking the bills of lading in its own name, becomes the legal owner of the goods, but its title is not an absolute but only a security title. If it permits the importer to take the goods on signing a trust receipt binding him to hold the same or their proceeds in trust, and subject to the order of the bank until its advances are paid, the transaction is not a conditional sale, but one for security only, and, where the bank reclaims the property and sells it as authorized by the trust receipts, the debt is not thereby canceled, but the bank may recover any deficiency remaining.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 51;* Sales, Cent. Dig. § 1326; Dec. Dig. § 455.*

What constitutes a contract of conditional sale, see note to Dunlop v. Mercer, 86 C. C. A. 448.]

### The following is the opinion of A. L. Everett, Special Master:

This proceeding is brought to determine the right to a certain fund deposited in bank pursuant to order by the receivers of the York Silk Manu-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

facturing Company. The German Bank of London claims the fund, and the claim is disputed by the receivers.

The receivers were appointed in an action brought in this circuit, entitled "Charavay & Bodvin, Complainant, v. York Silk Manufacturing Company, Defendant." This cause was ancillary to one in the court of common pleas for York county, Pa., in which the Western National Bank and others were the complainants, and the York Silk Manufacturing Company the defendant.

The facts which give rise to the dispute are these: The York Silk Manufacturing Company imported raw silk from China, its agents in Hongkong being Arnhold, Karberg & Co. For this purpose the silk company had applied to the German Bank of London (through the latter's agent, the Bank of New York, N. B. A.) in New York, and obtained from it a letter of credit in favor of Arnhold, Karberg & Co. for account of the silk company, amounting to £5,000, "for the cost of raw silk to be shipped from Hongkong to New York." This letter of credit provided that the bills of lading should be made out to the order of the German Bank of London, and that the bill of lading used for forwarding to the bank's agent in New York should be accompanied by an invoice properly certified. At the same time the silk company signed an agreement, of which the following provisions are material:

"We will place your bank, previously to the maturity of the bills that may be drawn under the credit, in possession of sufficient funds in cash. or. in bankers' bills of exchange at not exceeding sixty (60) days' sight, indorsed by us and approved of by you to meet the payment of the said bills," etc.

"Upon receipt from you of the possession of the said merchandise shipped under such credit or the bills of lading or other documents of title thereto, we will sign and deliver a receipt therefor in such form as you may require and will give such security as you may demand, and the said merchandise, after delivery of the custody thereof to us, and the proceeds thereof, if sold by us, shall be held subject to your order on demand as your property, with authority to take possession of and dispose of the same at any time by public sale or otherwise, for your reimbursement or protection and to charge all expenses, including commissions for sale and guaranty, the bank being free from all responsibility whatever in respect of such sale. Said merchandise shall be covered by insurance at our expense, loss, if any, payable to the German Bank of London, Limited.

"All questions arising under this agreement or the credit issued in connection herewith shall be determined according to the law of the State of New York."

The agreement also provides that, in the event of a decline in the market of such merchandise, additional security shall be deposited.

The letter of credit and agreement in question are dated July 5, 1907. Thereafter, from time to time, silk was bought and drafts were drawn under this credit. The drafts were accepted and paid by the bank. The bills of lading for the silk were duly made out to the bank's order. The invoices stated the value of the silk as $4 per pound. As it arrived, the bank permitted the silk company to take and hold it upon signing what are known as "trust receipts." By these trust receipts the York Silk Manufacturing Company agreed to hold the merchandise on storage as the property of the German Bank of London, Limited, with liberty, however, to manufacture it and to sell it, accounting for the proceeds to the Bank of New York, as the attorney of the German Bank of London, Limited, until all of the said bills of exchange should have been paid or provided for, "the intention of this agreement being to protect and preserve unimpaired the ownership and rights of the said bank in and to said property in whatever form or condition it may be, and the proceeds thereof, and to give said bank all rights in respect to said property and proceeds as provided in the agreement signed by us in connection with the credit under which said property was imported." The silk company failed to place the bank in funds to meet the drafts, and thereupon, under the credit agreement, all the obligations of the silk company immediately became due. The silk company having gone into the hands of receivers, the bank tried to recover from them the silk which had been obtained by the company in the way described, and it made petition to the court of common pleas of York county, Pa., where the receivers had been appointed and where the silk, or some of it, was,

to be permitted to retake such silk as had been taken under the trust receipts and could be identified. A certain amount was so identified. The court then made an order, upon consent of the receivers, directing them to deliver to the petitioner such merchandise, and ordering also that the receivers have authority to purchase the silk at $3 per pound. The order also contained this provision: "This order is made without prejudice to any existing right of the petitioners to present any additional claim or claims which they may have against the York Silk Manufacturing Company, defendant, or its receivers." From a receipt annexed to the order it appears that the silk was sold to the receivers for the sum of $5,207.05, which amount, less a charge of $500 of the attorneys for the petitioner in that proceeding, was received by the bank. At that time the bank had accepted or paid drafts amounting to a sum which, together with interest to July 1, 1908, aggregated £4,507 18s. 8d. Against this is to be credited the proceeds of the silk mentioned (less the attorney's fees), amounting to £966 10s. 10d., leaving a balance due and unpaid on July 1, 1908, of £3,541 7s. 10d., with interest from July 1st to September 1st; this amounts to £3,577 9s. 7d., or $17,458.10. In the proceedings in this circuit $15,222.40 was admitted by the receivers to be due to the bank, and, in accordance with the resumption agreement executed by the silk company and its creditors, the bank received satisfaction for that amount. It now claims the difference, amounting to $2,235.70, as of September 1, 1908.

Counsel for the receivers show that this is the difference between the invoice value (at $4 per pound) of the silk which was retaken in Pennsylvania and the amount (at $3 per pound, plus attorney's fees) which it actually realized, and they assert that the bank is not entitled to this difference, it having, by the retaking of the property, elected to satisfy itself from this source, and thereby abandoned the right to recover the full amount advanced by it for the purchase of the silk in China. This is on the theory that the transaction between the bank and the silk company constituted a conditional sale, and they invoke the familiar doctrine of election of remedies which obtains in connection with such transactions. Unless this applies, the bank must prevail, because it has admittedly advanced (with interest) the full amount of $17,458.10, and has only received satisfaction to the extent of $15,222.40. It is not necessary to consider the claim made against the receivers otherwise than as a claim against the silk company itself, nor do I understand it to be asserted by either side that the receivership introduces any distinguishing element.

In considering the nature of the relation between the parties, it must first be determined under what law the case is to be decided. The credit agreement provides that all questions under it shall be decided according to the laws of New York. The retaking of the property under the order of the York county court took place in the state of Pennsylvania. In the proceeding in Pennsylvania the credit agreement was before the court, and the silk must be presumed to have been surrendered in consequence of this credit agreement. The court made a special proviso that the order was made without prejudice to any existing right of the petitioners to present any additional claims which they might have against the York Silk Manufacturing Company or its receivers, and this, I think, must be construed as including the right to sue in this case upon the agreement as construed by the New York law. If this case were not to be decided by New York law; the result would, however, be the same, according to the view which I take of the Pennsylvania law and which I shall later briefly consider.

The first important decision in New York as to the relation of an importer of merchandise to the bank which makes advances to pay for the goods in his behalf is First National Bank of Cincinnati v. Kelly, 57 N. Y. 34. There the question was whether a bank holding the possession of goods under a bill of lading was required to file the papers as a chattel mortgage. The court, while holding the filing of papers unnecessary, refused to define the relation of the parties more accurately than to say that the bank, if not the absolute owner, stood in the position of mortgagee in possession; and added, "It is not of particular consequence what name is given to the transaction."

The next case was that of Farmers' & Mechanics' Bank v. Logan, 74 N. Y. 568. In that case the bank permitted the purchaser of wheat to obtain possession, the bill of lading being indorsed by the bank, with a direction that the

goods were not to be diverted until payment of the draft. It was held that the bank, notwithstanding the surrender of the goods, retained its stipulated rights in them. The court did not explicitly define the relation of the parties in these cases. For the purpose of maintaining its rights the bank, however, was held to be clothed with the legal title. "The result is, though, the transaction is not intended to give the permanent ownership, but to furnish a security for advance of money or discount of commercial paper made upon the faith of it." Again: "Hence, there was no relation between the plaintiff and Brown of pledgee and pledgor, and hence no giving up by it as pledgee of the possession of the property held by it in pledge to him while the general owner of it. It is not, therefore, needed that we consider whether, if such were the case, the special property or lien of the plaintiff was lost thereby." In this case, however, we have the first hint of the doctrine which the receivers' counsel now advances in order to defeat the bank's claim, namely, the doctrine of conditional sale, as follows: "Although such correspondents act as agents and are set in motion by the principal who orders the purchase, yet their rights as against him in the property are more like those of a vendor against a vendee in a sale not wholly performed, where delivery and payment have not been made, and where delivery is dependent upon payment." This suggestion was made by Judge Folger in order to make it plain that the transaction was not that of pledge, for, if it had been one of pledge, the bank, by surrendering the goods, would have lost its title, so, also, it would have lost its title if the transaction had been a mortgage. Judge Folger, however, it will be observed, while pointing out the analogy so far as the case before him was concerned, did not declare that the transaction was a conditional sale for all purposes, and with all its possible consequences.

Following this came Moors v. Kidder, 106 N. Y. 32, 12 N. E. 818. There the defendant bankers issued a letter of credit under a credit agreement substantially similar to that in this case. The bankers permitted the importer to take the goods, which were to be warehoused for their account. The importer, however, wrongfully entered them in the name of his broker and pledged the warehouse receipt with the plaintiff. It was held that the title of the defendant bankers was good against the plaintiff. The court upheld the validity of the trust receipt. Counsel for the plaintiff there tried to show that the relation created originally was that of pledgor and pledgee, and that the subsequent delivery of the goods under the trust receipt effected a relinquishment of the pledgee's rights. The court, denying that the relation was that of pledgor and pledgee, said that the bankers had all the rights of an owner requisite to enable them to retake their property. The doctrine of the Logan Case was reaffirmed, Finch, J., saying of it: "The doctrine stated was in substance that where a commercial correspondent, however set in motion by a principal for whom he acts, advances his own money or credit for the purchase of property and takes the bill of lading in his own name, looking to such property as the reliable and safe means of reimbursement up to the moment when the original principal shall pay the purchase price, he becomes the owner of the property instead of its pledgee, and his relation to the original mover in the transaction is that of an owner under a contract to sell and deliver when the purchase price is paid." Here, again, the court declares not that the transaction was a conditional sale, but that it had the quality of a conditional sale in the right of the banker to retake the goods.

This case was followed by the New Haven Wire Cases, 57 Conn. 352, 18 Atl. 266, 5 L. R. A. 300. They arose under conditions substantially similar to those in the case of Moors v. Kidder, except that the claim was made against the receivers of and not purchasers from the importer. The court appeared to think, and it was practically admitted in the argument of counsel, that all transactions for security must lie within three categories—mortgage, pledge, and conditional sale—and that in order to escape from holding that it was a mortgage or pledge they had to hold the transaction to be a conditional sale. It does not appear that the court's attention was called to the consequences which might follow such a holding. For the first time the cautious attitude adopted by the courts in this class of cases was abandoned.

Following this there came a Massachusetts case in which the nature of the banker's relation to the importer and the effect of trust receipts had to be considered. In Moors v. Wyman, 146 Mass. 60, 15 N. E. 104, the banker, plain-

tiff, had released certain hides to the importer to be tanned. He was allowed to recover the proceeds in the hands of the importer's assignee for the benefit of creditors. The court (per Holmes, J.) held that the title remained in the banker for the purpose of enforcing his security, rather inclining to think that the importer in obtaining the goods became the banker's agent, as the trust receipt literally provided. "Neither did Moors lose his rights by giving the custody of the hides to the Shaws. They expressly agreed to hold as Moors' agents, and the general rule is perfectly well settled that the custody of a servant or mere agent to hold is the possession of the master or principal." But the court did not adopt any one of the categories enumerated in the Connecticut case. It remarked, "The bank had a title, whether absolute or qualified does not matter."

In Moors v. Drury, 186 Mass. 424, 71 N. E. 810, the Massachusetts court had again occasion to consider the nature of this relation. The plaintiff banker had enforced his rights under the trust receipt against the goods, and sold them to satisfy the amount of his advances, without application to the court of insolvency, the importer having become an insolvent. If the bank had been a mortgagee or pledgee, this sale without authority of the court would have been unlawful. It was held: "We consider it well settled that under circumstances similar to those in this case a banker making advances and retaining the title is the owner and not a mortgagee or pledgee." See note, p. 20. Although the New Haven Wire Cases and Mershon v. Moors, infra, are cited, the court does not follow those authorities in so far as they define such a transaction as a conditional sale.

In Mershon v. Moors, 76 Wis. 502, 45 N. W. 95, the court followed the New Haven Wire Cases in defining a similar transaction as a conditional sale, but here, too, counsel seemed to have argued the case on the assumption that this was the only way in which such trust receipts could be enforced.

In Drexel v. Pease, 133 N. Y. 129, 30 N. E. 732, the plaintiff bankers had advanced money to the extent of 40 per cent. of their value on goods imported from France. They allowed the importer to get possession under trust receipts, and thence they came into the hands of his receiver. It was held that the bankers could recover the amount of their advances on the goods. The court follows Moors v. Kidder and the cases cited in it, Peckham, J., saying: "As stated in those cases, the doctrine is that where a commercial correspondent advances his own money or credit for a principal for the purchase of property for such principal, and takes the bills of lading in his own name, looking to the property as security for reimbursement, such correspondent becomes the owner of the property, instead of the pledgee, up to the moment when the original principal shall pay the purchase price, and the correspondent occupies the position of an owner under a contract to sell and deliver when the purchase price is paid. The correspondent's position is one of ownership so far only as is necessary to secure him for the advances he made upon the merchandise described in the bill of lading, and in such a case as this he is bound to sell upon receipt of the purchase price from the principal, or, in other words, upon receipt of the amount he advanced upon its credit. In no other sense is the correspondent the owner of the property." The court did not mean that it was in all respects a conditional sale. If it had been, one of the consequences would have been that the bank could have reclaimed the goods and kept them, and not been limited to 40 per cent. of their value.

In Pennsylvania the courts have held that deliveries under these trust receipts were bailments. They have explicitly repudiated the doctrine of conditional sales. They were compelled to do this, as there is a rule of law in Pennsylvania that the vendor, in the case of conditional sale, cannot prevail against the assignee in insolvency of the vendee, and there would have been great injustice in applying such a rule in the case of trust receipts. Brown v. Billington, 163 Pa. 76, 29 Atl. 904.

The Supreme Court of the United States has passed upon the question raised in the Logan Case. In Dows v. National Exchange Bank, 91 U. S. 618, 23 L. Ed. 214, the purchasers of grain happening also to be the owners of a storage warehouse, the bank allowed them to keep the property for its account, stipulating that it was to be delivered from the warehouse only on payment of the drafts drawn by the shipper. It was held that the bank was the own-

er and could recover against third parties, to whom the purchasers had wrongfully sold the grain; that the purchasers were in the position of a bailee. "The possession they had, therefore, was not their possession. It belonged to their bailors, and they were merely warehousemen and not vendees."

The English courts do not appear to have had occasion to consider these trust receipts, but they have frequently been required to discuss the relations of bank and buyer where bills of lading are issued in the name of it or of the shipper to secure the purchase price. They were for a long time indisposed to allow the jus disponendi to the extent demanded in the interests of the shipper or bank, but the demands of commerce were allowed to prevail, and in Mirabita v. Imperial Ottoman Bank (1878) 3 Ex. Div. 164, the law as it practically now is was summed up by Cotton, L. J., some of whose conclusions are embodied in the sales of goods act. He throughout treats the relation as depending upon the conduct and intention of the parties, and he sets forth a number of situations which can arise and the different consequences which respectively result from them.

In Glyn Mills & Co. v. E. & W. I. Dock Co. (1882) L. R. 7 App. Cas. 591, it was said, per Lord Blackburn: "From the terms of the application it is plain that the bankers were to have the property with a power of sale in the goods represented by the bills of lading, so far as was necessary to secure their advances, and that subject thereto Cottam & Co. (importers) were to remain owners of all the rest of the interest in the goods, and might do as owners everything consistent with the property thus given to the bankers. I do not think it is necessary to express any opinion on a question much discussed by Brett, L. J.—I mean whether the property which the bankers were to have was the whole legal property in the goods, Cottam & Co.'s interest being equitable only, or whether the bankers were only to have a special property as pawnees, Cottam & Co. having the legal general property. Either way the bankers had a legal property, and at law the right of possession, subject to the shipowner's lien, and were entitled to maintain an action against any one who, without justification or legal excuse, deprived them of that right."

The result of the cases is that, when a banker advances money for the purchase of goods and takes the goods as security, the contract of the parties in respect to the title and disposition of the goods will be recognized and enforced. If the banker stipulates for the legal title, that stipulation will be enforced to the extent necessary for his protection. The title is, in its nature, at all times a security title, and no more; and it is incident and subordinate to the general obligation of the purchaser to repay the banker his advance.

In this connection the difference between these transactions and true conditional sales is apparent. In cases of true conditional sale, where it has been held that the vendor having reclaimed and sold the goods cannot afterwards sue for his deficiency, it is pointed out by the courts that by retaking the goods the whole consideration has failed or been terminated, and that there is no further consideration upon which to sue. Earle v. Robinson, 91 Hun, 363, 36 N. Y. Supp. 178. When a banker advances money for the purchase of goods the result is different, because the consideration is different. The consideration is not the supplying of goods, but the supplying of funds. The goods themselves are no essential element in the contract, being merely security for its execution. The claim of the German Bank of London is not upon a cause of action for goods sold and delivered, but for money lent to or furnished for the silk company.

Certainly a banker never intends that the amount of his recovery shall depend upon the value of the goods. He is concerned only with getting back his advance, with interest and commissions. That is his business. Just as he has to return any surplus after a sale of the security, so he has a right of action for any deficiency which may result. It is clear enough that in the ordinary case, where the banker has not parted with possession of the goods under trust receipt or otherwise and is forced to realize upon them at a loss, he is entitled to claim for a deficiency, and there is no reason why, because he has given them up and retaken them, his rights should be any less.

If further illustration were needed of the difference between the transaction in question and a conditional sale, it can be found in this view of it: At whose risk is the property from the inception of the transaction?. No one will pretend that if the goods were destroyed at sea without insurance (there be-

ing no agreement for insurance) the loss would fall upon the bank. Yet, if the transaction were a conditional sale, the risk of loss would be upon the bank until it delivered the goods to the importer.

The application of the analogy of conditional sale to its remote consequences would produce here a great injustice. There is no authority, which necessitates such a holding, and, indeed, the cautious expressions of the courts leave it to be inferred that they do not intend this analogy to be pushed farther than the case requires. The transaction is not actually a sale, and that word is used only by fiction or analogy. It is not necessary to find in the nomenclature of security relations a category in which to place this one. It is governed by the contract of the parties, and the contract will only be disturbed by courts for illegality. It is not pretended that this contract is illegal. My conclusion is that the bank is not precluded by the retaking of the silk from recovering the loss which it has suffered by reason of the sale of the silk below the invoice valuation.

It is then to be determined whether the bank had the right to sell as it did. The credit agreement gives it ample powers in this respect, and the sale, in the absence of proof of fraud or willful neglect, must be supposed to be a fair one.

The question was raised whether the bank is entitled to recover the fee of $500 paid to its attorneys in Pennsylvania. This, I am of opinion, it can charge under the credit agreement as an expense of the sale. The propriety of the amount of the fee was not questioned before me, and I find it to be permissible in amount.

I accordingly find that the German Bank of London is entitled to recover the amount of its claim as above stated, with interest.

Since writing this opinion, I learn that in the proceedings in the assignment of Richardson and Denny in Boston, about 15 years ago, the holder of trust receipts was allowed to prove for his deficiency after realizing upon the security. The proceedings were uncontested.

Davies, Stone & Auerbach and Shattuck & Glenn (Charles E. Hotchkiss and Garrard Glenn, of counsel), for receivers.

Wilmer, Canfield & Stone (Harlan F. Stone, of counsel), for German Bank of London, Limited.

WARD, Circuit Judge. The exceptions to the report of the special master are overruled, and the report confirmed on his opinion.