## In re JAMES, Inc.

Circuit Court of Appeals, Second Circuit.
January 7, 1929.

No. 116.

Leo Oppenheimer, of New York City (Milton P. Kupfer and Phillip W. Haberman, both of New York City, of counsel), for appellant Commercial Investment Trust.

Tracy, Chapman & Tracy, of Syracuse, N. Y. (John Thomas Smith and Frank A. Gaynor, both of New York City, of counsel), for appellant General Motors Acceptance Corporation.

Costello, Cooney & Fearon, of Syracuse, N. Y., for appellants Syracuse Investment Corporation and Syracuse Mortgage Corporation.

Charles A. Phelps, of Watertown, N. Y., for appellees trustees of James, Inc.

Purcell, Cullen & Pitcher, of Watertown, N. Y. (Henry Purcell, of Watertown, N. Y., of counsel), for intervening respondents.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge. Receivers in bankruptcy were appointed November 13, 1924, for James, Inc., a corporation. Prior thereto it had a selling agency for motorcars at Watertown, N. Y., and contiguous territory. It financed its purchase of cars through the appellants Commercial Invest-

ment Trust, General Motors Acceptance Corporation, Syracuse Investment Corporation, and Syracuse Mortgage Corporation, and the interveners, Northern New York Trust Company, Northern Acceptance Corporation, and Jefferson County National Bank. The securities given took the form of trust receipts in the cases of Commercial Investment·Trust and General Motors Acceptance Corporation, chattel mortgages in the cases of the Northern New York Trust Company and Northern Acceptance Corporation, and conditional sales contracts in those of the Syracuse Investment Corporation, Syracuse Mortgage Corporation, and Jefferson County National Bank. Each of the creditors named began reclamation proceedings against the trustees to recover motorcars claimed as their property. The proceedings were consolidated into one. The automobiles were sold under written stipulation of all the parties, and the claims of the respective parties, it was agreed, should attach to the fund with the same force and effect as if the automobiles had not been so sold.

The practice followed, when loans were made by the Commercial Investment Trust and General Motors Acceptance Corporation, was that when James, Inc., wished a shipment of cars from the manufacturer, it purchased under order and requested that they be shipped to it, and notified the Commercial Investment Trust or General Motors Acceptance Corporation of this fact. The cars were shipped by the manufacturer, with sight draft attached to the bill of lading; both sight draft and bill of lading indorsed in blank by the manufacturer were sent to a local bank and held pending the completion of the transaction. James, Inc., sent to the bank, in the case of the Commercial Investment Trust, 20 per cent. of the sight draft, and, in the case of the General·Motors Acceptance Corporation, 15 per cent. thereof.

In the case of the Commercial Investment Trust, the· bank paid the sight draft with the funds furnished by it and made remittance to the manufacturer. It then required James, Inc., to pay 20 per cent. of the draft and execute a trust receipt and certain time drafts or acceptances to it for payment of the balance of the purchase price, all of which was delivered by James Inc., to the bank. It then in turn received the bill of lading under which the motorcars were obtainable. In the instance of the General Motors Acceptance Corporation, the bank received 85 per cent. of the sight draft from that corporation, and James, Inc., paid 15 per cent. to the bank and received the bill of lading. In both instances, however, James, Inc., had an investment of 20 per cent. or 15 per cent. of the cost of the motorcar before it signed the trust receipts, and it then took actual possession of the cars.

The Commercial Investment Trust provided in its receipt: "In consideration whereof we agree at our expense to hold said motorcar vehicle in trust for C. I. T. as their property and agree to return the same on demand in good order and unused, but with liberty to us to exhibit and sell the same for their account for cash for not less than $509.58, the intention being to preserve unimpaired, C. I. T.'s title thereof, * * * and we further agree in the case of such sale to keep the proceeds separate from our funds and immediately hand such proceeds to C. I. T. We further agree to keep a separate account of all motor vehicles delivered to us on this or any like receipt."

The General Motors Acceptance Corporation receipt differed from the Commercial Investment Trust, in that there was an agreement not to sell, loan, deliver, pledge, or mortgage or otherwise dispose of the motorcars to any other person without payment of the amounts shown on the original release orders held by the bank of like identification number and permission was given by the indorsement of the bank on record of release.

The trust receipts of the Commercial Investment Trust concerned 27 cars, and of these 22, either before or immediately after their purchase by the Commercial Investment Trust, were attempted to be liened by the Northern Acceptance Corporation under an alleged chattel mortgage. In obtaining this security, it attempted to take cars, at least in part, still in the possession of the common carrier, after ascertaining the serial numbers from memoranda invoices of the manufacturer then in the hands of the bankrupt. These chattel mortgages were all executed in bulk accounts, to replace prior defalcations of security underlying prior indebtedness, and without the advancement by it of any additional funds.

Of these 22 cars, 5 were also liened to the Syracuse Mortgage Corporation under date of November 8, 1924, and 29 other cars, which were subject to trust·receipts of the General Motors Acceptance Corporation, were also liened by the Syracuse Mortgage Corporation. The latter had done business with the bankrupt for months before the Commercial Investment Trust transactions took place. The District Court held that the chattel mortgages were invalid for noncompliance with section 16 of the state Stock

Corporation Law, relating to stockholders' consents, but further held that the appellants, holders of trust receipts, were unable to assert their invalidity. It is not shown that either of the trust receipt holders, appellants, knew or had reason to believe that the bankrupt's financial condition was unsound when it took its securities. The financial statements given by the bankrupt justified both of these trust receipt holders making the advances which they did.

The conditional contracts of sale taken by the Northern New York Trust Company, the Northern Acceptance Corporation, and the Jefferson County National Bank have been declared to be invalid as a preference security, and each of these interveners are now, by the decree, in the position of general creditors. They have not appealed, but appear and urge the affirmance of the decree below.

The Syracuse Mortgage Corporation and its affiliated company, the Syracuse Investment Corporation, in making its advances or loans, had the bankrupt execute a bill of sale to the Syracuse Investment Corporation, and the latter in turn executed a bill of sale to the Syracuse Mortgage Company, and the Syracuse Mortgage Company entered into a conditional sales contract with the bankrupt. A conditional sales contract contemplated a vendor and vendee, not a lender and borrower of money. The instruments of the Syracuse Mortgage Corporation, from October 8th until the receivership, involved many large accounts and covered many motorcars, and such were not purchased in the ordinary course of the automobile trade by it. Its officers had knowledge of the financing of the appellants General Motors Acceptance Corporation and Commercial Investment Trust.

The court below held that the Personal Property Law (section 43, subd. 1 [Consol. Laws, c. 41]) did not inure to the benefit of the trustees in bankruptcy, but that the trust receipts must be treated as conditional sales agreement, holding that the title never passed to the signer of the trust receipts, but went directly from the manufacturer to the finance corporation, saying: "This court * * * will hold that the trust receipts, so called, are conditional contracts of sale, rather than chattel mortgages, and are void for lack of filing." With respect to the Syracuse companies, the court held that they were not conditional sales contracts, as they purported to be in form, but chattel mortgages, and that as such, as against the trustees in bankruptcy, they were invalid for noncompliance with section 16 of the Stock

Corporation Law (Consol. Laws, c. 59), and that the trust receipt holders were not in a position to assert the invalidity of these chattel mortgages.

In trade practice and by the support of the judicial authority, a trust receipt might equally be used in connection with a domestic transaction as it is used in an importation of merchandise. In re A. E. Fountain, Inc. (C. C. A.) 282 F. 816; In re Ford-Rennie Leather Co. (D. C.) 2 F.(2d) 750; Century Throwing Co. v. Muller (C. C. A.) 197 F. 252; In re Perlhefter (D. C.) 177 F. 299. The holder of a trust receipt, if he derives his security title from a person other than the one responsible for the satisfaction of the obligation which the property secures, is not obliged to file his security as is required in the case of a chattel mortgage. In such case only can he deliver the property to the obligor to act as his fiduciary. In re A. E. Fountain, Inc., supra.

There are various forms of chattel security, as a pledge, conditional sale, or mortgage. But the trust receipt does not, on its face or by its name, purport to conform to any of these types. It is not a pledge, for a pledge depends upon possession of the parties secured, and, when possession is lost, so is the security. While the title in the case of a pledge is in the pledgor, or in another than the pledgee, such is not true in a trust receipt, where the title is intended to remain in the party secured while the possession is intrusted to one who has a certain interest as yet indefinite in the property. The practice of a conditional sale bears some resemblance to a trust receipt. Possession cannot be retaken until there is a default; whereas in a trust receipt, it can be retaken at any time. The holder of the trust receipt is not interested in the sale of the property or its commercial or market value. If he retakes the goods, and sells them for an amount in excess of the sum, this excess belongs to the buyer or importer; whereas, in a conditional sale, the buyer is interested only in such amount as he has paid on account of his contract. In any event, the holder of the trust receipt does not sell the goods to the importer or domestic trader, and whether or not the bank, finance company, or individual has an intention of selling goods to him, it lends him credit and advances the money for the buyer's account.

In the case of a mortgage, whether of chattels or realty, the security is dependent upon the title, as distinguished from a pledge, which rests upon possession. Title is given to the person, while possession may be given

to the mortgagor, or the debtor, or his representative. The title thus conveyed to the mortgagee is as security for the performance of his obligation, and, in the case of a trust receipt, title has never been in the importer or domestic buyer, and he consequently cannot convey such title back to the holder of the trust receipt. If the mortgagor conveys this title to the mortgagee as security for the performance of an obligation of a third person, the equity of redemption belongs to him, and not to the third person, and the property reverts to him upon performance of the obligation by the third person. In a trust receipt, under no circumstances does title revert to the manufacturer or seller. It has been recognized that there are sound business reasons why it is unnecessary to record trust receipts, and also that they should have superior protection as compared with an unrecorded chattel mortgage, when they are given to a lender of money by some one other than the debtor, and where either the delivery or possession against trust receipts is made to the debtor. Dows v. Nat. Exchange Bank, 91 U. S. 618, 23 L. Ed. 214; In re K. Marks & Co. (C. C. A.) 222 F. 52; In re Cattus (C. C. A.) 183 F. 733; Charavay & Bodvin v. N. Y. Silk Mfg. Co. (C. C.) 170 F. 819; Moors v. Kidder, 106 N. Y. 32, 12 N. E. 818.

After the trust receipt was executed and delivered to the appellants, the trustee obtained no rights superior to those of the finance companies appellants. Their claims must first be satisfied out of the property trusteed. In re Cattus, supra; Charavay & Bodvin v. N. Y. Silk Mfg. Co., supra. For it appears, from the transactions here relating to each appellant who holds trust receipts, that the parties intended title to remain until the loan was satisfied. Each trust receipt recognized the existence of the security title in trust receipt holders, and this prior to the bankrupt's even procuring possession of the bill of lading or the motorcars. The trust receipts conferred a power of sale, with the corresponding duty, however, to keep the proceeds separate, and immediately hand such proceeds to each trust receipt holder. As title to the motorcars was not in the bankrupt, neither was the money received from their sale. And such security title of a trust receipt, when it properly comes to its holder from the exporter or manufacturer, and not from one whose debt is secured thereby, will be protected. In re A. E. Fountain, supra. Both the General Motors Acceptance Corporation and the Commercial Investment Trust, as holders of such trust receipts, the former forbidding the sale altogether and the latter permitting a sale, but enjoining and requiring the bankrupt to account for the proceeds, have valid first liens against the fund. Ludvigh v. American Woolen Co., 231 U. S. 522, 34 S. Ct. 161, 58 L. Ed. 345; Sturm v. Boker, 150 U. S. 312, 14 S. Ct. 99, 37 L. Ed. 1093.

But it is argued that the trustees in bankruptcy acquired rights under the Factors Act which provides (Personal Property Law, § 43, subd. 1) that "every factor or other agent, * * * who shall be intrusted with * * * any merchandise for the purpose of sale, or as a security for any advances to be made or obtained thereon, shall be deemed to be the true owner thereof, so far as to give validity to any contract made by such agent with any other person, for the sale or disposition of the whole or any part of such merchandise and any account receivable or other chose in action created by sale or other disposition of such merchandise, for any money advanced, or negotiable instrument or other obligation in writing given by such other person upon the faith thereof."

This statute was intended to protect subsequent bona fide purchasers and subsequent specific lienors. Soltau v. Gerdau, 119 N. Y. 380, 23 N. E. 864, 16 Am. St. Rep. 843. The trustees in bankruptcy do not occupy the position of a bona fide purchaser for value or the holder of a specific lien. A trustee is not in the position of an innocent purchaser, mortgagee, or pledgee, and must take his title subject to all valid prior liens, claims, and equities. Bailey v. Baker Ice Machine Co., 239 U. S. 268, 36 S. Ct. 50, 60 L. Ed. 275; Sexton v. Kessler, 225 U. S. 90, 32 S. Ct. 657, 56 L. Ed. 995; In re Remson Mfg. Co. (C. C. A.) 232 F. 594. The trust receipt prevails as against a trustee in bankruptcy, and, since the provisions of the Factors Act were intended to protect only bona fide pledgees and bona fide mortgagees, none of which positions these trustees in bankruptcy occupy, they therefore acquire no right superior to that of the holder of the trust receipts. Nor does the Factors Act protect junior claimants, for it inures only to those acquiring valid liens on specific security.

Section 16 of the Stock Corporation Law of 1923 (Consol. Laws, c. 59; section 6 of the Stock Corporation Law of 1909 [Laws 1909, c. 61]) requires a consent to the execution of a mortgage, except a purchase-money mortgage, by the holders of not less than two-thirds of the total number of shares outstanding entitled to vote thereon, given either in writing or by vote of a meeting of

stockholders called for that purpose in the manner prescribed by another section of the same law. Such statutory provision applies to chattel mortgages. In re Astell Eng. & Iron Wks. (D. C.) 278 F. 743; In re Eagle Steam Laundry Co. (D. C.) 176 F. 740. And, without assuming such statutory authorization and the filing of the consent, the mortgage is void. In re Progressive Wall Paper Corp. (D. C.) 230 F. 171; Leffert v. Jackman, 227 N. Y. 310, 125 N. E. 446.

As correctly pointed out below, the instruments of the Syracuse companies, though in the form of conditional sales contracts, were in fact chattel mortgages, and were not executed with the consent required by the statute. Susman v. Whyard, 149 N. Y. 127, 43 N. E. 413. The trust receipt holders who were thus connected with the title of the motorcars are in the position to raise any question as to the liens attempted to be imposed upon their title. Williams v. Gaylord, 186 U. S. 157, 22 S. Ct. 798, 46 L. Ed. 1102; Commerce Trust Co. v. Chandler (C. C. A.) 295 F. 241; In re Progressive Wall Paper Corp., supra; Leffert v. Jackman, supra. The Syracuse companies, like the Northern New York Trust Co., Northern Acceptance Corporation, and the Jefferson County National Bank, are entitled to share only with the other general creditors, for their securities are invalid. The trust receipts held by the General Motors Acceptance Corporation and the Commercial Investment Trust are valid, and are a first lien against the fund now held by the trustees. The District Court is directed to enter a decree in conformity with this opinion.

Decree reversed.