## Puerto Rico Auto Corporation, Petitioner, v. Tax Court of Puerto Rico, Respondent.

No. 293.    Argued January 26, 1953.—Decided September 17, 1954.

*Vicente M. Ydrach* for petitioner.  *J. B. Fernández Badillo, Acting Attorney General,* and *J. C. Santiago Matos, Assistant Attorney General,* for intervener, respondent in the main action.

Mr. Justice Belaval delivered the opinion of the Court.

The juridical facts on which our decision in the instant case is based are the following: The Puerto Rico Auto Corporation was, during the years in which the tax in litigation was imposed, the exclusive distributor for the territory of Puerto Rico of certain automobiles manufactured in the

United States of America. In order to purchase those vehicles, the Puerto Rico Auto Corporation placed its order with the manufacturer and asked the Banco Popular de Puerto Rico to open a credit account in the city of New York for a sum equal to the total purchase price. This credit was used to pay to the manufacturer for the merchandise ordered by the Puerto Rico Auto Corporation. The manufacturer prepared the corresponding shipping papers for the transportation of the merchandise consigned to Puerto Rico. The order bills of lading were delivered in New York to the agent of the Banco Popular de Puerto Rico, who sent them directly to the bank.

Upon arrival of the merchandise in Puerto Rico, the Banco Popular de Puerto Rico gave notice to the Puerto Rico Auto Corporation. The latter could remove the merchandise from the pier after drawing a sight draft on the bank and issuing a trust receipt as security for the purchase price of each automobile, in the following terms:

"TRUST RECEIPT. TO SECURE A LOAN.
"In consideration of the sum of $ .... dollars to us this day loaned by the Banco Popular de Puerto Rico we have set aside as the property of the said bank the following goods and merchandise: . . . . . . .

"And in consideration of the said loan we hereby agree to hold said merchandise in trust for the Banco Popular de Puerto Rico as its property, with liberty to sell the same for its account, but without authority to make any other disposition whatever of the said goods (or the proceeds thereof) either by way of conditional sale, pledge or otherwise, and further agree, in case of sale, to hand the proceeds to it as soon as received, to apply against the loan of $ .... by the said Banco Popular de Puerto Rico, for our account, and for the payment of any other indebtedness or obligation of ourselves to it.

"We agree to keep said goods insured to their full value against fire, payable in case of loss to the said Banco Popular de Puerto Rico, with the understanding that it is not to be chargeable with the storage, premiums or insurance, or any other expenses incurred on said goods. We further agree that

no failure or omission on our part to fully carry out any of the terms of this or any other similar receipt or agreement or of any other agreement with the said Banco Popular de Puerto Rico, maker of the loan of $ ...., shall be deemed a waiver by the said bank of its rights or remedies, under either or any of said papers, unless the said waiver shall be in writing, indorsed thereon, and signed by the said bank.

"The Banco Popular de Puerto Rico may at any time cancel this trust, and take possession of said goods, and of the proceeds of such of the same as may then have been sold, wherever the said goods or proceeds may then be found. The intention of said agreement is to protect, and preserve unimpaired, the title of the Banco Popular de Puerto Rico, to the said merchandise and the proceeds thereof."

After the documents in question were signed, the Banco Popular de Puerto Rico delivered the bill of lading to the Puerto Rico Auto Corporation, which presented the same to the shipping company, and the latter in turn delivered the automobiles consigned by the manufacturer. As soon as the automobiles were sold in Puerto Rico, the Puerto Rico Auto Corporation paid over to the bank the amount of the draft, which the bank returned together with the corresponding trust receipt.

Some of the automobiles brought to Puerto Rico by means of this transaction were standing on the piers in San Juan on January 15, 1949. The former Treasurer of Puerto Rico regarded them as the property of the Puerto Rico Auto Corporation and assessed the corresponding property tax for the fiscal year 1949–1950. The petitioner resorted to the former Tax Court of Puerto Rico requesting, among other things, the elimination of the item as to the automobiles on the piers, on the ground that those vehicles were neither the property of nor in the possession of the Puerto Rico Auto Corporation as of January 15, 1949.

The former Tax Court of Puerto Rico, speaking through Judge Romero, denied the elimination as well as the reconsideration requested. Judge Polo concurred with the order

108

denying reconsideration. The Puerto Rico Auto Corporation, petitioner herein, assigns two errors on appeal: (1) "That the Tax Court of Puerto Rico erred in not concluding that the vehicles which were standing on the piers of San Juan on January 15, 1949, and which had not been removed by that date by the Puerto Rico Auto Corporation, *were not the property* of the said Puerto Rico Auto Corporation," and (2) "That the Tax Court of Puerto Rico erred in not applying to the instant case the doctrine laid down by that court in *Puerto Rico Auto Corporation*, plaintiff, v. *Treasurer of Puerto Rico*, defendant, case No. 3 DTC 524, in which it held that the vehicles standing on the piers represented by trust receipts were not the property of or in the possession of the said Puerto Rico Auto Corporation."

A trust receipt seems to be a hybrid institution within the reasoned science of law. For over 60 years the authorities have endeavored to place within the traditional legal concepts that supple and elusive security which leisurely promenades arm in arm with other theories and formal structures of the juridical science, arousing curiosity at times and resentment at others, with no other logic than the logic of the time which produces it. We judges have become used to dealing with it as one of those complexes created by modern economic society, which must be more aptly studied by its effects on persons and things rather than by its reasonability within the science of law. Thanks to the patient and at times fruitful effort of the jurists, we know now what a trust receipt is not, which is always one way of knowing something.

The trust receipt is not a classical consignment for sale, because the distributor or importer, like any regular purchaser, becomes the debtor for the thing consigned. The trust receipt is not a technical trust, properly speaking, because the trustee may dispose, within the normal operation of the juridical business, of the thing given in trust, for his own benefit, and he is not bound to convey it to any

beneficiary or to redeliver it to the constituent. The trust receipt is not a pledge, because the possession is in the debtor and not in the creditor, and further, because the creditor would become the owner of the thing given him as a pledge. The trust receipt is not a bailment, because the bailee is not bound to restore the thing deposited, and further, because he may dispose of it freely. The trust receipt is not a limited agency, because the debtor sells in his own name and does not thereby bind the principal. The trust receipt is not a chattel mortgage, becase the creditor is the owner of the thing mortgaged. The trust receipt is not a conditional sale, because the creditor may take possession before the nonperformance of the terms of the contract takes place, which the typical conditional vendor could not do. The trust receipt is not an ownership title to the thing, because the thing is purchased for and delivered to someone else, who assumes the obligation to pay the purchase price by means of a loan, receipt of which is acknowledged by the debtor. The trust receipt is not a possessory right as differentiated from an ownership right, because possession, as a fact, can not be recognized in two different persons, and as title, the mere possession of the movable thing is sufficient.

We have examined closely the provisions of Act No. 41 of April 23, 1928 (Sess. Laws, p. 294), known as "An Act to Provide for the Constitution of Trusts (Fideicomissa), and for Other Purposes," as amended by Act No. 211 of May 8, 1952 (Sess. Laws, p. 504), the original act having been incorporated in the 1930 edition of the Civil Code of Puerto Rico, §§ 834 to 874; §§ 1762 to 1772 of the Civil Code of Puerto Rico, dealing with the pledge; §§ 1658 to 1684 of the Civil Code of Puerto Rico, dealing with the depositum; § 1211 of the Civil Code of Puerto Rico, dealing with the power to contract in the name of another; §§ 162 to 198 of the 1932 edition of the Code of Commerce of Puerto Rico, dealing with commercial commission; Act No. 19 of June 3, 1927 (Spec. Sess. Laws, p. 490), "To Authorize the

Mortgage of Personal Property and to Provide for the Recording of Mortgages So Executed in a Special Registry, and for Other Purposes"; §§ 2 and 3 of Act No. 61 of April 12, 1916 (Sess. Laws, p. 123), and § 6 thereof, as amended by Act No. 40 of June 27, 1925 (Sess. Laws, p. 246), dealing with conditional sales; §§ 1334 *et seq.* of the Civil Code of Puerto Rico, dealing with purchase and sale, and § 1339 in particular; and §§ 360 to 395 of the Civil Code of Puerto Rico, dealing with possession, and we find that under our local legislation the conflict between the trust receipt and our own law would be the same.

However, it is fair to recognize that the trust receipt partakes of some of the characteristics of the classical consignment for sale as well as of trust, pledge, bailment, and agency; it somewhat resembles a chattel mortgage, although with some of the elements of the conditional sale; it is partly an ownership title and a little less than a possessory title. We are therefore faced with a sort of technical trust, coupled with a limited agency, mainly designed to serve as security for a purchase price: 49 A.L.R. 285, § II b; 87 A.L.R. 305, § II b; 101 A.L.R. 454, § II b; 168 A.L.R. 36, § II b.

An analysis of these four annotations reveals that up to 1924 the American authorities had maintained with sufficient uniformity that the holder of a trust receipt, namely, the bank or the financing company advancing the money for the purchase of the goods ordered by the distributor, was the true owner of the article purchased, since he held a species of a security title. After 1924 the courts were divided, some of them maintaining that the ownership title was in the holder of the trust receipt and others that it was in the distributor: 87 A.L.R. 309, § III. This diversity of opinion prevailed in some states until 1933, when the Uniform Trust Receipts Act was adopted, recognizing in the bank or in the. entruster a security interest, and in the importer or distributor an ownership right subject to the payment of the interest secured.

In order to sanction the operation of the trust receipt, the jurisprudence had to face three highly serious objections. The first was that trusts cannot be secret. As a question of fact, trust companies and the trust business are under strict control by almost all of the states. As a question of law, in almost all state legislation there exists a provision similar to that of § 11 of our Act No. 41 of April 23, 1928, which is incorporated in our Civil Code (§ 844), and which provides: "Secret trusts are prohibited." The second objection was that the right of buyers in due course cannot be affected by any pre-existing trust agreement between the trustee and the vendor with indicia of ownership to sell the article in the open market. The third objection was that the right of the other creditors could not be affected by any liens on the debtor's personal property not recorded in a public registry. In order to face this situation, some states adopted the Uniform Trust Receipts Act (9A Uniform Laws Annotated 285, Edward Thompson Co. ed., 1951). However, in the light of the trust reserve, the balance of the authorities is in favor of the buyers in due course and against the creditors of the importer or distributor.

In those states where the Uniform Trust Receipts Act has not been adopted, such as Puerto Rico, the trust receipt continues to be valid as between the credit bank and its debtor for the purchase price, whether it is considered as a loan, or as an advance of the purchase price, technical trust, or limited agency, but it does not operate as against buyers in due course of goods in possession of the debtor, although it has priority over the common creditors of the debtor whenever it does not conflict with the local law regarding the recording in a public registry of the liens on personal property. This last aspect is the most conflicting because it presents not only the diversity of the statutory provisions but also the diversity of the facts of the case. Fortunately, we need not pass upon either of the two points in order to decide the instant case.

The evident disparity of the American authorities on the real character of the transaction involved has served, however, to establish two more rational and systematized criteria: (1) that although the trust receipt has some of the elements of the other contracts or juridical acts already mentioned, it should be regarded as a different legal institution, capable of absorbing certain principles of the other legal institutions, but preserving its autonomy as an institution adopted to satisfy the wants of the mercantile economy (local usages and customs?); (2) that although it is a common-law institution, organized as a separate juridical body, each one of its elements may be isolated, or grouped into a whole, "to look at the substance rather than the form," 87 A.L.R. 303, 305, in order to determine its juridical effects in relation to the persons involved in the contract as well as to third persons, or to the different events that took place at each stage of its perfection or consummation. Hence, the new institution may be considered as a whole in order to look to its real nature as a security, considering jointly the purchase order, the letter of credit, the bill of lading, the draft drawn by the importer or distributor in favor of the bank and the trust receipt itself, or its different elements may be isolated to prove at a given moment its relation to the principles of the technical trust, the pledge, bailment, agency, chattel mortgage, and the conditional sale, and to determine, with respect to the particular situation of the parties involved, the possible division of ownership or possessory rights as between them. *In re James, Inc.*, 30 F. 2d 555, 557–58 (Manton, 1929) (difference between the trust receipt and the pledge, the chattel mortgage and the conditional sale); *T. D. Dowing Co.* v. *Shawmut Corporation*, 139 N. E. 525, 526 (Rugg, 1923) (dealing with the possible relation of agency between the importer and the financing bank); *Commercial Discount Co.* v. *Los Angeles County*, 105 P. 2d 115, 117 (Shenk, 1940) (the trust receipt is not a chattel mortgage); *Walton* v. *Commercial Credit Co.*, 299 N. W. 300,

302 (Warren, 1941) (the trust receipt more nearly falls under the category of conditional sale than a chattel mortgage); *C. I. T. Corporation* v. *Commercial Bank of Patterson*, 149 P. 2d 439, 444 (Ward, 1944) (possession alone is insufficient to give rise to a valid trust receipt transaction); *General Motors Acceptance Corporation* v. *Thompson*, 292 N. W. 85, 87 (Morris, 1940 (". . . a trust receipt does not conform strictly to any other type of security, such as chattel mortgages, conditional sales, pledges, leases, consignments, bailments, and the like, although in it are prominent characteristics of more than one of these types."); *General Motors Acceptance Corp.* v. *Seattle Ass'n Etc.*, 67 P. 2d 882, 885 (Main, 1937) (dealing with the character of the trust receipt security; at p. 884 it is held that secret liens which are prejudicial to the general creditors are not favored by law); *Klett* v. *Security Acceptance Co. et al.*, 242 P. 2d 873, 882 (Schauer, 1952) (". . . Trust receipts are 'a method of securing debt and not of creating a debt' . . ."); as respects the character of the trust receipt as security, see *The Trust Receipt as Security* by Karl T. Frederick, XXII Columbia Law Review 395 (1922); *The Trust Receipts* by John Hanna, XXIX Columbia Law Review 545; 2 *Fraudulent Conveyances and Preferences* 958, by Carrard Glenn, Baker Voorhis & Co. ed. (1940).

Both the Uniform Trust Receipts Act and the commentaries in the law reviews *supra* and *infra* have reached the conclusion that, as a matter of law, the trust receipt operation involves a distribution or division of property interest in the thing purchased.

On this latter aspect, the divided property interest between the financing bank and the distributor who is financed, the work of L. Vold, learned professor of the University of Nebraska, entitled "Trust Receipt Security in Financing of Sales," 15 Cornell Law Quarterly 543, University of Cornell Edition, 1930), is notable. Professor Vold establishes at the outset the four successive stages in the tripartite trust

receipt transaction: (1) the preliminary stage, which might be termed negotiation of purchase and credit, in which the distributor ascertains on what terms desired goods can be purchased and what financial backing can be obtained from a banking house; (2) the second stage, which may be called that of procuring credit, the distributor contracts with the banking house for the opening of credit in his favor; generally, in the import trade this is often supplied in the form of a letter of credit from the banking house to the manufacturer or his banking correspondents, promising to pay drafts for the price of goods purchased by the distributor, the drafts to be accompanied by bills of lading for the goods, made out either to the order of the banking house or to the order of the shipper and properly endorsed by him to the banking house; (3) the third stage, which may be called the stage of shipment under contract, wherein the manufacturer ships the goods ordered by the distributor in accordance with the terms of the credit arranged for, drawing at the same time his draft for the price on the banking house, or on the buyer, as the case may be, accompanied by the order bill of lading as collateral security, to be forwarded through banking channels for presentment for payment; (4) the fourth stage, which may be called the stage of banker's advances on the security of the order bill of lading, which is reached when the banking house pays the draft, taking as security the order bill of lading; thus, in the import trade it is common for the seller to draw on the foreign correspondent of the banking house under the terms of the letter of credit, the details of surrender of the documents in exchange for payment being there carried out, and the correspondent forwarding the documents to its principal. The most important element of all that takes place in this stage is that the banking house advancing the purchase price retains control of the order bill of lading until it gets the trust receipt from the distributor.

The conclusion reached by Professor Vold is that during the first stage the property interest and right of possession of both the bank and distributor are indeterminate; in the second stage the distributor has a potential beneficial interest in the goods while the banking house holds a legal title as security up to the amount of the purchase price; at the third stage the possession is in the shipper, the right to hold the goods as security is in the bank, and the beneficial interest is in the distributor; in the fourth stage the distributor holds his beneficial interest, and the bank has a right to hold as security and possess the goods until the distributor draws his draft for the purchase price and a trust receipt; when the bank endorses the bill of lading to the distributor, the latter acquires possession (possession in the name of another?) in addition to the beneficial interest which it has held from the outset.

It follows from the foregoing that the important element, for present purposes, is that from the second stage the distributor has a recognizable property interest in the goods, particularly in a jurisdiction like Puerto Rico where the sale is perfected as soon as the purchaser and the vendor agree on the thing and the price thereof, even though neither the thing nor the price has been delivered.

After a careful analysis of the local legislation applicable to the so-called trust receipt operation, we lay down as a local rule the following:

(1) Any trust receipt agreement whereby a local importer or distributor of goods manufactured within or outside Puerto Rico negotiates with a bank or financing company for the opening of credit for the obtainment of the thing, and agrees that the bank or financing company shall retain the property title or right of possession of the thing purchased until the importer or distributor pays the purchase price and the credit expenses, is perfectly legal in Puerto Rico, such obligation being valid and enforceable as between both parties.

(2) The importer or distributor has a recognizable property interest in the thing purchased under a trust receipt sale, which may be transformed into an absolute property interest as soon as the purchase price is paid, subject to the right of the bank or the credit company to hold title and the right of possession as long as the price advanced for the purchase of the thing remains unpaid.

The Tax Court of Puerto Rico did not err, therefore, in upholding the validity of the property tax on the merchandise standing on the piers as of January 15, 1949, inasmuch as the petitioner held a recognizable property interest in such merchandise from the moment the sale was perfected in New York and, hence, at any successive delivery stage subsequent to the agreement on the thing and the price, independently of any right in the Banco Popular de Puerto Rico to hold title or the right possession as security for the advances made on the purchase price.

As respects the second assignment, petitioner has not convinced us that it is our duty to apply the rule of *stare decisis*, particularly in a case like this where the decision is not one of a court of last instance.

The judgment appealed from will be affirmed.

Mr. Justice Marrero and Mr. Justice Sifre did not participate herein.