## In re ALDAY MOTOR CO.
### No. 5452.

District Court, D. Tennessee, at Chattanooga.
Dec. 26, 1930.

Cantrell, Meacham & Moon, of Chattanooga, Tenn., for Hamilton Nat. Bank.

Joe Frassrand, of Chattanooga, Tenn., for Chattanooga Finance Co.

TAYLOR, District Judge.

This matter is before me on the referee's certificate to review orders disallowing the claims of the Hamilton National Bank in the sum of $6,150, and of the Chattanooga Finance Company in the sum of $16,352 as secured. The claims were allowed as unsecured. There are also involved incidental items in connection with each. A stipulation was entered into under the terms of which the automobiles involved were sold and the proceeds are in the custody of the bankruptcy court, subject to the claims of all creditors.

The facts entering into a decision of the questions presented by both petitioners have been treated as practically identical, and they are consolidated in the certificate. A typical transaction will be detailed as representative.

The bankrupt was a local corporation engaged as dealer in automobiles at 1214 Broad street, Chattanooga, Tenn., with J. H. Alday president and R. B. Stewart secretary-treasurer. Petitioners for some time prior to adjudication were financing for the bankrupt the purchase of new cars from the manufacturer. When the bankrupt purchased automobiles, they were shipped consigned to the manufacturer, with sight drafts, bill of lading, and order notify, sent direct to the petitioner Hamilton National Bank or to some other bank. Upon notice to the bankrupt its secretary-treasurer would execute a note payable to one of the petitioners in an amount representing the value or practically the value of the shipment. The proceeds of the note would be deposited in the bankrupt's account in the Hamilton National Bank, and at the same time the bankrupt would draw check against said account in favor of the bank holding the draft and bill of lading. When the petitioner finance company advanced the money, the transaction would be different only in that the money was advanced to the bankrupt in the form of a check, which would be deposited by the bankrupt to its credit, and its check drawn against the account in favor of the bank holding the draft. At the same time the secretary-treasurer of the bankrupt, acting as agent of one of the petitioners, would execute a so-called trust receipt in the following form:

"Received of (either petitioner bank or petitioner finance corporation) for storage, the automobile described herein to be stored in the building 1214 Broad Street, Chattanooga, Tennessee (here description motor number of automobile).

"The undersigned custodian is not the owner of the automobile covered by this receipt, either solely, jointly or in common with others, but holds same as agent or a bailee for (one of petitioners) ready at any time to deliver to (one of petitioners) or its as-

signs upon return of this receipt properly endorsed.

"[Signed] R. B. Stewart."

This trust receipt would be. attached as collateral to the note executed by the bankrupt. Upon receipt of bankrupt's check drawn in favor of the bank holding the draft and bill of lading, both would be delivered to the bankrupt's secretary-treasurer, who would return to its place of business and draw its check in favor of the railroad company for freight charges, etc. The matter of unloading and taking possession of the cars was turned over to the manager of the bankrupt's used car department, who would place them on display. There was an agreement between petitioners and the bankrupt that the latter's secretary-treasurer, who was employed and paid by it, would represent petitioners in the possession of the cars and in the matter of seeing that they were not sold by the bankrupt unless it could and would make a suitable payment on the appropriate note. The bankrupt's right to so sell for cash or on time or for part cash and in exchange for used cars was understood, and such transactions were numerous. When used cars were taken in part payment for new ones, so-called trust receipts in the same form were customarily executed by Stewart in favor of the petitioner who had been interested in financing the purchase of the new car sold or exchanged. It was understood between petitioners and Stewart as their agent and the bankrupt that Stewart would not surrender possession of any liened car unless and until the bankrupt was in position to and would discharge the lien. Nothing was done except as a matter of bookkeeping to identify or segregate either the used or new cars so handled or to bring notice to the public of the fact that they were claimed by either petitioner. For some time it had been the custom for the bankrupt to sell or exchange' the cars and deposit the proceeds of such sales to its credit and draw its checks in favor of the interested petitioners, and in transactions in which a used car was involved to execute a so-called trust receipt covering the used car and substitute such trust receipt as collateral just as though the transaction had been an original. one, as above stated. The proceeds of such sales were not segregated or turned over as such to either petitioner except occasionally.

Both petitioners claim security on the idea that the automobiles belonged to bankrupt and were pledged to them as security or that they were held as petitioner's property under trust receipts.

The trust receipts, of course, indicate that they were executed upon the idea that the automobiles, both new and used, were the property of one of the petitioners, and held by Stewart as petitioner's agent to be surrendered to petitioner at any time upon return of the receipt. This is inconsistent with a true pledge. It appears therefore that the intention of the petitioners certainly was to secure the money advanced by them by the trust receipt method. If the trust receipts are to be held valid and enforceable, it is essential that petitioners once had title to the property, and likewise that their title came through the manufacturer or other than through the bankrupt—the borrower. If title vested in the petitioners prior to the execution of the trust receipts, it may be assumed here that nothing occurred thereafter to render the transaction invalid or unenforceable. As to the new cars involved, when the bankrupt borrowed money from one of petitioners with which to gain possession of the property, title was in the manufacturer. When the bankrupt deposited the proceeds of such loan to its account in the bank against which it customarily drew its checks, the title was not thereby affected. When the bankrupt drew its check payable to the bank holding the draft with bill of lading attached, that was simply the usual method in transactions where similar property is shipped C. O. D., and the title passed with delivery of the bill of lading and paid draft from the manufacturer to the bankrupt as between the bankrupt and petitioners with possession or at least custody of the property still with the railroad company. When the railroad company's freight charges were satisfied, the property was delivered to the bankrupt, and it then had both title and possession. I can see nothing in this transaction vesting title in petitioners at any time, and certainly petitioners could not claim title through the manufacturer under these facts.

An examination of the numerous authorities cited leaves no question but that title in the claimants, other than through the borrower, is essential to the validity of a trust receipt, as such. Since this was the method attempted by the parties to secure the indebtedness, it may be that petitioners cannot be heard to now say they intended the property of the bankrupt to be held as a pledge by the secretary-treasurer of the bankrupt as petitioner's agent, though that is not decided.

The case of In re James, Inc. (C. C. A.) 30 F.(2d) 555, 557, very ably discuss-

es the essential elements of trust receipts, and while certain statutes are involved in that case not applicable here, the general principles controlling are not thereby affected.

In discussing and differentiating types of security and pointing out their essential elements, the court used this language: "In the case of a mortgage, whether of chattels or realty, the security is dependent upon the title. as distinguished from a pledge, which rests upon possession. Title is given to the person, while possession may be given to the mortgagor, or the debtor, or his representative. The title thus conveyed to the mortgagee is as security for the performance of his obligation, and, in the case of a trust receipt, title has never been in the importer or domestic buyer, and he consequently cannot convey such title back to the holder of the trust receipt."

The District Court in its opinion [30 F. (2d) 551, 553], which was being reviewed in the opinion just quoted, held "that the trust receipts, so called, are conditional contracts of sale rather than chattel mortgages, and that they are void for lack of filing." The Circuit Court disagreed with that conclusion, for the reason that under the facts of that case title had never passed to the purchaser who was in that case, as in this, the receiptor; that the bankrupt (receiptor) could not therefore convey title back to the holder of the trust receipt. The facts of the James Case are readily distinguishable from the present case, both as to the method of handling bills of lading and as to the form of the trust receipt which embraced the conditions under which a sale might be made, if at all, before payment of the balance due. But as we have seen, title, in the instant case, passed to the bankrupt when it acquired the bill of lading. If the title to this property was not in petitioners—holders of the so-called trust receipts—before the receipts were executed, and title passed to the petitioners upon their execution, the distinction is readily seen, and the reasoning of the District Judge in the James Case, 30 F.(2d) 551, not questioned on review, becomes applicable here. If, as this court holds, title was in the manufacturer when the trust receipt was executed, and the receipt had the effect of passing the bankrupt's after-acquired title to the petitioners, it could not be more than an unrecorded chattel mortgage, but it is not held that they would have been valid as mortgages had they been recorded. That they were not executed by the bankrupt, but by Stewart is one invalidity. Further in the opinion in the James Case on review [30 F.(2d) 555, 558], this language

is found: "In a trust receipt, under no circumstances does title revert to the manufacturer or seller. It has been recognized that there are sound business reasons why it is unnecessary to record trust receipts, and also that they should have superior protection as compared with an unrecorded chattel mortgage, when they are given to a lender of money by some one other than the debtor, and where either the delivery or possession against trust receipts is made to the debtor." The case of In re A. E. Fountain, Inc., 282 F. 816, 25 A. L. R. 319, also decided by the Second Circuit Court of Appeals, recognizes this principle.

As to the used cars taken by the bankrupt in part payment for new cars against which trust receipts had been executed by Stewart, either as secretary-treasurer of the bankrupt or trustee or trust agent of the petitioners, it can hardly be urged that title thereto was ever in the petitioners, or certainly not before the execution of the trust receipt. If title passed under the trust receipt, it must be upon the idea that in its execution Stewart was acting for the bankrupt and not as trust agent of the petitioners. Those who exchanged the used cars in part payment for new ones did not know the petitioners in the transactions, and there is no claim that title to the used cars passed to petitioners in that way.

It has been assumed hereinbefore that nothing transpired after the delivery of the new cars to the agent of petitioners that would render trust receipts unenforceable as against the trustee in bankruptcy, but that is not decided. I am of opinion, however, for the reasons above stated, that the liens cannot be enforced upon the trust receipt theory. But upon the idea that title vested in the bankrupt, and that thereafter possession was in Stewart as agent of petitioners to be held for them as pledges, there is much in the record to render that assumption unwarranted. The bankrupt had much too free hand in the sale and exchange of the property, and there was too loose an agreement with reference to the disposition of proceeds of sales by the bankrupt to permit a court to sanction it as an enforceable pledge.

■ The Sixth Circuit Court of Appeals case of Biles & Co. v. Elliotte, 215 F. 340, 342, bears no material analogy to the case now being considered. True in the Biles Case there was a bill of sale and delivery to Biles & Co. at the time the bankrupt procured the loan. But the decision in that case seems to rest upon a subsequent transaction. Biles & Co. sold the car to the bankrupt. The bankrupt gave Biles & Co. possession,

and thereafter the property was entrusted to the bankrupt as bailee. While such bailee, the bankrupt lost possession of the property without the consent of Biles & Co., and thereafter Biles & Co. regained possession by replevin and had possession when the trustee brought the reclamation proceeding. The terms of the agreement between Biles & Co. and the bankrupt as to how the bankrupt was to deal with the car or its proceeds, if it were later sold, do not appear, further than the opinion recites the possession as bailee afforded "opportunity for demonstration and sale of the car." It cannot be assumed that the agreement, as in this case, authorized sale and commingling of funds. In the present case the proceeds of sale were commingled with other funds of the bankrupt, and the only limitation upon a sale for cash seemed to be that thereafter a payment equal to the amount received would be made to the petitioner, whose security was thought thereby reduced. There was nothing in such agreement to create other than the relationship of debtor and creditor between petitioner and bankrupt as to such proceeds. It was not to be segregated or held expressly for petitioner's account.

▮▮▮ The principle announced in the case of McClung v. Colwell, 107 Tenn. 592, 64 S. W. 890, 89 Am. St. Rep. 961, is relied upon by petitioners. The rule there announced seems to be in accord with the generally accepted idea that the pledgee's lien is not lost by surrendering possession to the pledgor as agent for a specific purpose not inconsistent with the contract of pledge—in that case to exchange pledged stock for stock in another corporation, the latter stock to be taken in the pledgee's name. In cases of which this transaction is typical, the courts are in accord that the lien is not lost. In cases in which the surrender of possession of the pledged property to the pledgor is for such purposes and under such circumstances that the pledgor may pass title in it to another under promise to thereafter discharge the obligation to secure which the pledgee was taken, the lien of the pledgee is lost, and he becomes the unsecured creditor of the pledgor. The test is not whether the pledgee has lost possession of the property, but whether he has surrendered possession generally to the pledgor—as to sell with the promise on the pledgor's part to thereafter discharge the secured obligation. If possession passed to the pledgor to sell as pledgee's agent the proceeds of the sale would come into pledgor's hands as pledgee's agent impressed with a trust. It must be borne in mind that the bankrupt was a corporation, and it was the corporation and not Stewart to which the power of sale was delegated. Stewart was the agent of the petitioners, and it is to Stewart petitioners insist they intrusted the pledged property. Stewart, the agent of petitioners, permitted the corporation to sell the cars, and I think the following factual situation is determinative. I accept the statement of fact carried into one of the briefs of a petitioner that: "Mr. Thompson of the Finance Company repeatedly warned Stewart, especially after he started unloading them at 100 per cent. (value) not to let them out of his possession unless the indebtedness against the automobile could be paid off. He told Stewart as treasurer of the Alday Motor Company and as pledge holder of these particular automobiles not to let them out of his possession unless they were paid off. The instructions given by Thompson to Stewart not to let the automobiles out of his possession unless they could be paid off was always followed by Stewart."

▮▮▮ It was the practice, as the proof clearly shows, for the bankrupt to deposit the proceeds of sales of cars with its general funds and draw its check to a petitioner. This was notice of and acquiescence in the practice of trusting the bankrupt to sell the cars not as agent of the pledgee, but on its own account with the assurance that it was able to and would thereafter discharge the debt to secure which the car had been pledged. Only on a few occasions was this practice varied, and then only when the bankrupt thought its bank account might become overdrawn by reason of outstanding checks before a check given pledgee would reach the bank. In such cases the purchaser's check was indorsed over to pledgee. This was the exception, not the rule or understanding. The understanding or agreement existing with reference to the automobiles in the bankrupt's hands when the petition was filed must be determined not altogether from the words used by the parties, but from the course of dealing that had existed between them with reference to other automobiles held by Stewart under the same agreement.

The learned referee has ably and painstakingly reviewed the facts and the law applicable to them, and his conclusions are satisfactory.

▮▮▮ As to the various excessive interest charges claimed by the trustee, the record shows, in so far as it shows anything upon the subject, that such usurious interest was

in fact paid by purchasers (not by the bankrupt) and simply passed on by the bankrupt to one·of the petitioners. In such a situation the trustee has no claim to it.

 I think what has been said relative to the cars in the bankrupt's hands when the petition was filed is inapplicable to the proceeds paid over and alleged to constitute preferences. In those instances the fund actually reached the petitioner before the bankruptcy petition was filed, the fund involved was created by the advances made by the petitioners, and the particular transactions were under such circumstances as to leave the question at least so close and doubtful and the equities so strongly favorable to the petitioners that I do not feel disposed to disturb the referee's findings with reference thereto.

If time permitted, it would be desirable to go more fully into detail with reference to the facts involved, and to somewhat further discuss the numerous authorities cited by petitioners, but the referee's opinion and the certificate are so clear and at the same time exhaustive that further discussion may not be necessary.

The referee's order will be confirmed.