[Sac. No. 6170. In Bank. Apr. 17, 1952.]

HAROLD A. KLETT, Appellant, v. SECURITY ACCEPTANCE COMPANY (a Corporation) et al., Respondents.

Horace E. Dunning for Appellant.

Wilke & Fleury, H. Nelson French, Sherman C. Wilke and Gordon A. Fleury for Respondents.

SCHAUER, J.—Plaintiff appeals from a judgment, entered pursuant to a jury verdict for defendants, in this action for the recovery of usurious interest and penalties and for the conversion of certain furniture. We have concluded that no prejudicial error or miscarriage of justice is shown and that, in accord with the mandate of section 4½ of article VI of the state Constitution, the judgment should be affirmed. Because, however, there was error in instructing the jury, it is necessary to quote, or to epitomize in some detail, a substantial amount of the evidence to show that the error was not prejudicial.

Some of the testimony of plaintiff, such as that in reference to the circumstances of his meeting Mr. Parker and the events immediately preceding his dealings with defendants, scarcely seems material to either cause of action but since plaintiff evidently thought that these matters were important and the jury heard them from plaintiff's lips, mention of them is made. The jury may have felt that the evidence threw some light on plaintiff's circumstances, his business methods, and the nature of his dealings with defendants.

## The Usury Cause of Action

Plaintiff, in November, 1945, was a furniture salesman employed by the Standard Furniture Company in Sacramento; he decided that he wished to go into the furniture business on his own account. He had met a Mr. Parker, "the first time the day I came from Stockton to the Sacramento Alcoholics Anonymous Club, and we became friends through our work together, and in that philosophy we follow in Alcoholics Anonymous." Mr. Parker "used to come to the store" where plaintiff was employed; further, according to plaintiff's testimony, Mr. Parker said "he would like to go into the furniture business with me here. This conversation possibly went on for two or three months." Plaintiff and Mr. Parker then, on November 13, 1945, orally agreed to form a partnership and on that date plaintiff left his employment with the Standard Furniture Company. Plaintiff testified, "I told Mr. Parker that I was unable to go into business as far as finances were concerned . . . I said, 'I will consider going in business with you if you will put up the money against my experience . . .' . . . At that time he said he would arrange for twenty five hundred dollars, and not very long after he would have twenty five hundred dollars more. I said, 'It would be useless to go in for less than five thousand dollars at this time.'" On November 29, 1945, Mr. Parker "put up one thousand dollars" and on December 4, five hundred dollars. Parker advanced no more money. In the meantime, plaintiff testified, he expected a Dr. Leiser to purchase a storeroom and rent it to plaintiff; on the strength of his expectations of getting a location and the capital which Mr. Parker had promised, plaintiff made buying trips to San Francisco and Los Angeles and purchased several thousand dollars worth of furniture; he also purchased a used automobile.

Plaintiff testified, "there wasn't any use in trying to establish a credit. . . . I told the manufacturers we would pay for this merchandise when it was delivered, or before it was delivered . . . I was to notify them for future delivery." After the first $1,000 was advanced by Parker, plaintiff paid for some of the furniture he had ordered, paid $150 for a sales tax bond, and paid for the used automobile.

Plaintiff then discovered that Dr. Leiser had not purchased the building which he (plaintiff) had expected Dr. Leiser to purchase and lease to the new partnership, and, having no storeroom, plaintiff caused the furniture he had purchased

to be placed in storage with Western Van & Storage Company. He then noticed (about December 2, 1945) that a building near the one which he had expected Dr. Leiser to purchase appeared to be empty; plaintiff contacted the owner, who at first was not interested in plaintiff as a tenant; however, although the owner would not enter into a lease he finally agreed to permit the new partnership to rent the building on a month to month basis on condition, suggested by plaintiff, that the latter "would give his son a position." Upon this agreement plaintiff caused the stored furniture to be moved into the rented building on or about December 4 or 5. Mr. Parker put up the $500 above mentioned on December 4 and this sum went for "payment of rent and telephone deposits, gas and electricity deposits, and the general conduct of the business, and repairs. We had to put a floor in our store."

Plaintiff repeatedly asked Mr. Parker for more money but Mr. Parker said it was not available. On December 4, 1945, at plaintiff's request, defendant Kenneth Forrest, vice-president of defendant finance company, met plaintiff at the latter's home. Plaintiff, while an employe of Standard, had seen Mr. Forrest in the Standard store. Concerning their meeting on December 4, plaintiff testified, "I told him . . . that I was having difficulty and that difficulty was in getting enough capital to start this business. And I told him that Raymond Parker and I had agreed to go in business; and I told him it didn't look like I was going to get very far on this new store without some financial assistance.

"I asked him if his company would be interested in any way in helping me finance this business. . . . We discussed furniture contracts, and the sale of furniture. And I told him that if he would help me at this time, in this way of financing or flooring,[1] that I would be able to give him a good deal of our sales contract business.[2] . . . And we dwelled a great deal on the plan we had been using [?] If he decided to do so, how we would sell our furniture contracts to him and his

---

[1] The term "flooring," as it is used in this case, was explained to the jury in the following instruction (given at plaintiff's request): "Merchandise is 'floored' when it is financed under a trust receipt or similar title retention document, whereby a retail dealer obtains possession of the same from a distributor for exhibition and sale through payment to distributor by a bank or other financing agency."

[2] The "sales contract business" referred to by plaintiff is the sale at a discount of conditional sales contracts between plaintiff and his retail customers.

firm . . . And before he left my home he told me that he would go along with us after knowing the structure that we had at this time to the extent of five thousand dollars; and that I would have to floor, or finance with them only the major pieces of furniture. The smaller items he would not be interested in because it would be hard to keep track of. . . . He said 'I will go along to five thousand dollars worth of flooring or financing.' "

Plaintiff and Kenneth Forrest arranged a meeting on December 5 with Kenneth's father, president of defendant finance company, and plaintiff's partner, Parker. At this meeting, plaintiff testified, the elder Mr. Forrest "told me that they would put 90 per cent into these purchases and that we would pay one per cent a month on the flooring, and that this merchandise would be paid off individually from these trust receipts[3] that I signed later as we sold the merchandise and delivered it. . . . If the merchandise was on the floor for a period of thirty days we were to pay him one per cent a month for that privilege of having that, or whatever you want to call it, that flooring; but had the merchandise been sold before that time—for example, if merchandise would come in on the first of the month, and we sold it on the fifth of the month, we were also instructed that we were to pay one per cent at that time."

It is apparent from plaintiff's testimony as above quoted that he was asking for, and received, something more than a mere loan of money or credit for interest. He admitted that he had no credit and that it would be useless for him to try to establish credit. He was asking the defendants to finance his business; to do almost the very thing, short of becoming a partner, which Parker had agreed to do but had failed to do. He was asking defendants, in effect, to purchase for cash from manufacturers the major items of furniture which were to constitute his stock in trade; to pay 90 per cent of the cost thereof while plaintiff advanced only 10 per cent of such cost; to keep an inventory of each item of furniture so stocked; to permit plaintiff to have possession of such furniture, to display it on his salesroom floor and, ordinarily at least, not to expect to be repaid for his advances or his costs of doing business until and unless the furniture items were sold to retail purchasers; "we were to pay him [defendants] one per cent a month for that privilege of having that, or whatever you want to call it, that flooring."

---

[3]The form of the "trust receipts" is hereinafter quoted in footnote 4.

As indicated above it was agreed that defendant finance company would advance 90 per cent of the wholesale price of furniture selected by plaintiff for purchase, in a total amount not to exceed $5,000 (later increased to $7,500), that plaintiff would pay the remaining 10 per cent of the purchase price, and that title would be vested in defendants but possession for purposes of display on the salesroom floor would be in plaintiff. Pursuant to this arrangement plaintiff obtained from defendant finance company a series of loans. On the occasion of each loan plaintiff executed to the finance company a document entitled "trust receipt."[4] These documents evidence a security interest of the finance company in furniture which is described therein and which plaintiff, by virtue of the arrangement, put in his store, exhibited, and sold or attempted to sell to retail customers. The finance company made a monthly charge of one per cent of the face amount of each "trust receipt." Also, during the period of the dealings between the parties, plaintiff, pursuant to the previously mentioned oral arrangement with Forrest, sold conditional sales contracts between plaintiff and his retail customers to the finance company, at discounts which amounted to about 17 per cent of the face value of the contracts; the sales of these contracts were without recourse by the finance company against plaintiff.

---

[4] Such documents read in material part as follows: "TRUST RECEIPT . . . [Plaintiff] as Trustee holds in trust for SECURITY ACCEPTANCE CO., Entruster, as security for payment of the amount hereinafter set forth on the due date hereinafter specified, and all other obligations of Trustee to Entruster whether heretofore or hereafter incurred, the following personal property: [description] . . . in which personal property a security interest remains in or is hereby transferred to Entruster as security for such payment. Trustee agrees to hold said personal property in trust as the property of Entruster for the purpose of sale or exchange and to deliver same to the Entruster upon demand. Entruster may at any time . . . either before or after the due date repossess said personal property without notice or demand of any kind and for such purpose Entruster or his representatives may without legal process enter any premises in which said personal property is located. . . .

". . . The Trustee may . . . sell said personal property for cash or on terms approved in advance by Entruster for not less than the amount due Entruster hereunder . . .; provided, however, that upon such sale all moneys hereby secured shall become immediately due and payable and all of the proceeds and considerations received in such sale shall be forthwith delivered to Entruster as security for payment of said moneys and until so delivered shall be held · by the Trustee separate from the funds of the Trustee and as security for such payment.

"In event of the repossession of the said personal property the Entruster may on or after default give notice to the Trustee of intention to sell and may at any time not less than five (5) days after the giving of such notice sell said personal property at public or private sale, with

Plaintiff has discussed at great length the elements of a trust receipt relationship before and after enactment of the California version of the Uniform Trust Receipts Law (Civ. Code, §§ 3012-3016.16) and has argued at great length that the elements of the relationship described in that law were not present in the various "trust receipt" transactions here.[5] Plaintiff's arguments in this regard concern aspects of the trust receipt transactions which would be relevant only if rights of third parties (e.g., persons with prior liens on the furniture) were involved. Since it is undisputed that the transactions resulted in some sort of security interest in the finance company and since the name of the type of interest is immaterial, it is unnecessary to describe in detail the manner in which these various transactions were handled or to construe with particularity the Uniform Trust Receipts Law in its exact application to each transaction. For convenience of discussion the documents entitled "trust receipts" will be so referred to, but from this reference no implication that we are passing upon the law of trust receipts in relation to possible intervening rights of third persons is to be drawn. Our concern here is not whether the requirements of the Uniform Trust Receipts Law were met in all respects, but whether the jury's

or without notice and without any further notice or demand to the Trustee and without having said personal property at the place of sale, and may at any public sale itself become a purchaser. The proceeds of any such sale shall be applied, first, to payment of the expenses thereof; second, to payment of the expense of retaking, keeping and storing said personal property . . .; third, to the satisfaction of the Trustee's indebtedness hereby secured; and, fourth, to the payment of any other obligation owed by Trustee to Entruster. The Trustee shall receive any surplus and shall pay unto Entruster upon demand any deficiency.

''Notice of intention to sell shall be deemed sufficiently given when in writing and either personally served on the Trustee or when deposited in the United States mail postage prepaid addressed to the Trustee's last known business address.

''In the event of default by the Trustee in the payment of any moneys hereunder due on the due date hereof, Entruster may declare all moneys secured immediately due and payable. In event of such default Entruster may at his option and in lieu of sale as hereinabove provided declare a forfeiture of the Trustee's interest in said personal property against cancellation of the then remaining indebtedness in accordance with the provisions of Section 3016.2 of the Civil Code of the State of California.

''No waiver of any existing default shall be deemed to waive any subsequent default and all rights hereunder are cumulative and not alternative.''

[5]From his opening statement on throughout the trial, except perhaps in connection with his motion for a directed verdict, plaintiff argued that the transactions evidenced by the trust receipt documents were ''not trust receipts transactions'' but were ''mere loans.'' The error of this position, which was adopted by the trial court, is discussed later.

verdict that usury was not committed and that defendants did not convert plaintiff's property can properly be sustained.

Plaintiff urges that as a matter of law the one per cent per month charges were interest at a rate in excess of that permitted by section 22 of article XX of the state Constitution.[6] The controlling issue, however, as to this element of the case, is whether the monthly charges were exclusively for the forbearance of money or were for other services either wholly or at least in such part as to leave the amount paid as interest, if any, within a legal rate. This presents a question of fact and the evidence on it is conflicting but the issue does not appear to be a close one. Plaintiff's own testimony conflicts within itself; in significant parts, however, it corroborates the testimony of defendant Kenneth Forrest (the only defendant who testified).

■ Plaintiff in his testimony variously described the charges as "for the privilege of having that . . . flooring" and as "interest." Forrest testified that in their preliminary negotiations "I mentioned the fact to Mr. Klett that I would charge him 1 per cent a month charges on flooring of merchandise." Forrest further testified, "Q. What was that 1 per cent for, Mr. Forrest? A. The charge of enabling him to have our furniture in his store and other consideration. Q. Would that be for, let us say, writing up the trust receipt and handling the invoice and such as that? A. Yes, sir, that would include writing up the trust receipt, the bookkeeper's time, making up a ledger card and putting it in the books and making up the addressograph plate to enable us to send the notice, and the notices themselves and the mail. . . . Q. And for the use of that money you made a charge of 1 per cent, is that correct? A. For the privilege of his having my furniture in his store I charged him 1 per cent a month." Plaintiff himself testified, it will be remembered, that "we were to pay him [Forrest] one per cent a month for that privilege of having that . . . flooring." Further tending to support the implied finding of the jury that the one per cent charge was intended by the parties not as interest but as compensation for the arrangement under which plaintiff, without substantial capital or credit, was enabled to start and carry on a business and to that end was allowed to select for

---

[6]Cal. Const., art. XX, § 22: "The rate of interest upon the loan or forbearance of any money . . . shall be seven per cent per annum but it shall be competent for the parties to any loan . . . to contract in writing for a rate of interest not exceeding ten per cent per annum."

purchase, purchase, and display the furniture in his store, are plaintiff's references in his testimony to his "ten per cent equity" in the furniture as to which the finance company was advancing 90 per cent of the wholesale price.[7]

Plaintiff further urges that as a matter of law the sales of his conditional sales contracts to the finance company at discounts of about 17 per cent were made under a scheme which secured to the finance company a collateral advantage and which was made for the sole purpose of evading the usury laws by giving the finance company a usurious profit on the loans. Such a scheme is usurious. (*Terry Trading Corp.* v. *Barsky* (1930), 210 Cal. 428, 432 [292 P. 474].) But there is ample evidence to support the implied finding of the jury that the discount sales of the conditional sales contracts were bona fide sales of property, were without recourse as against plaintiff or his partner, and were transactions made at plaintiff's request, and not part of a usurious scheme. (*Cf. Milana* v. *Credit Discounting Co.* (1945), 27 Cal.2d 335, 340 [163 P.2d 869, 165 A.L.R. 621].)

In connection with his argument that he was forced to sell his conditional sales contracts unprofitably plaintiff (citing 65 C.J., p. 101, § 177, and 22 C.J., p. 104, § 46) says that there is a presumption that the market value of those contracts was their face value. Since it is a matter of common knowledge that many retailers customarily discount such contracts and many finance companies purchase them, we cannot agree that there is any such presumption.

Plaintiff asserts that even if the evidence does not show as a matter of law that the discounting of the contracts was a device to evade the usury laws, certain rulings of the trial court prevented him from properly presenting the question to the jury as one of fact. He complains of the trial court's refusal to give the following formula instruction (requested by plaintiff): "if you find that the relationship existing between plaintiff and defendants herein was that of borrower and lender, insofar as the transactions occurring between the plaintiff and defendants evidenced by trust receipts are concerned, and you find that said transactions were

---

[7]We also note that plaintiff's original complaint does not seek recovery of usurious interest and penalties, but only seeks damages for conversion. This might be considered as tending to show that his claim that the charges were usurious interest was but an afterthought, prompted by litigation.

in fact loans of money,[8] and you further find that as a condition of making such loans the defendants required the plaintiff to sell to said defendants at less than their reasonable, fair market value time contracts covering the sale of furniture by plaintiff to plaintiff's customers, then you must find that for the purposes of this action the amount under the reasonable, fair market value that each time contract was discounted is to be considered interest." The instruction was properly refused, for "the mere fact that . . . [a borrower] may have been required to enter into an unprofitable contract as a condition to a loan of money would not itself make the loan usurious." (*Terry Trading Corp.* v. *Barsky* (1930), *supra*, 210 Cal. 428, 432.) Furthermore, as will

[8]Here again, plaintiff suggests the erroneous view that trust receipt transactions and loans are mutually exclusive of each other.

In his opening statement plaintiff's counsel said, "Now, Mr. Klett . . . maintains throughout and has alleged in his complaint, that the transaction as carried on between himself and the defendant here was nothing more nor less than a loan of money. That is going to be one of the principal things that you folks are going to have to be looking for as the evidence develops . . . Now . . . the defendant . . . will claim that the transaction . . . between my client and themselves did not result in a loan of money, but that it was something else.

"We will show that . . . Mr. Klett signed certain instruments . . . entitled 'Trust Receipts' and they were furnished by the defendant . . . We will also show . . . and prove, that these transactions were nothing more nor less than a loan of money, and that the defendant, for that loan of money, charged a rate of interest which we will prove to you is in excess of the amount that was permitted . . . under the laws of this state . . . Now, it is going to be up to you . . . to determine what the transaction was."

Again, in introducing in evidence the documents denominated "trust receipts" plaintiff's counsel insisted on the view that bona fide trust receipt transactions and loans of money were mutually exclusive of each other. The record shows: "MR. DUNNING [plaintiff's counsel]: I am introducing the instruments but, I want it understood that I am not introducing the instruments for the purpose of showing that they are trust receipts. THE COURT: You are introducing them but you claim they are not trust receipts? A. I claim they are not trust receipts, yes. THE COURT: All right, you can put them in for that limited purpose. MR. DUNNING: In other words, I want it understood I am putting them in for the limited purpose and not for the purpose of establishing that they are trust receipts but for the purpose of showing the amount owing, if any, on December 27, 1946, from the plaintiff to the defendants and for the purpose of showing that the defendants had a security interest in the merchandise which is listed on these instruments entitled 'Trust Receipts.' MR. BEDEAU [defendants' counsel]: Aren't they going in for all purposes regardless of whether you call them chattel mortgages or trust receipts? THE COURT: No, he isn't introducing them—I don't understand myself about the security interest—but he wants to limit it for the two purposes and I guess that is all right."

The above quoted statements of position by counsel for plaintiff are referred to *infra*, p. 782, in connection with an instruction given by the court which erroneously adopts the position taken by plaintiff.

appear more in detail from instructions hereinafter quoted, the jury were properly instructed that "all the circumstances [and dealings of the parties] must be inquired into to determine whether . . . there was a usurious charge of interest."

■ Plaintiff further complains that he was not allowed to prove the fair market value of the conditional sales contracts because, when he asked Forrest, on cross-examination and with no offer of proof or statement of purpose, whether the 17 per cent discount was "about the prevailing rate of discount," defendants' objection to the question was sustained. If we assume that the question was designed to elicit evidence of the fair market value of conditional sales contracts, and that it was proper on cross-examination of defendant Forrest after plaintiff had rested his case on direct examination, the sustaining of the objection thereto nevertheless could not have prejudiced plaintiff because, as previously stated, the jury impliedly found upon ample evidence and sufficient instructions that defendants did not require the sale of the contracts as a condition of making the loans. In this connection the jury were told, among other things, that "where different transactions have been entered into and these different transactions are relied upon in making a charge of usury all the circumstances must be inquired into to determine whether or not such collateral agreement or separate agreement was intended to be and was a part of another agreement, and considering the two together there was a usurious charge of interest." (See also further instructions quoted *infra*, pp. 786-787.)

As hereinabove mentioned, the court apparently accepted the view of the law suggested in plaintiff's opening statement and offer of proof as quoted in footnote 8, *supra*, page 781, and gave instructions which erroneously assume that a "trust receipt" transaction and a usurious loan are mutually exclusive concepts.[9] In fairness to plaintiff it is pointed out that

[9]Such instructions read as follows: "If the transactions between the parties were trust receipt transactions and not loans, then the question of interest is not involved, and under such circumstances there can be no claim of usurious or unlawful interest."

"In determining whether the transactions were loans or whether they were under trust receipts, you must determine what the transactions were by a consideration of all the evidence, and not merely from what the parties or documents appear to be or the parties represent themselves to be.

"It is necessary for you to determine whether the transactions were loans or were trust receipt transactions:

"If you find as follows: The parties, prior to their later transactions,

while he made the opening statement, offer of proof, and request for instruction as shown in footnote 8 and its context, he did not request the instructions quoted in footnote 9; these latter instructions appear to have been formulated and given by the court of its own motion. ■ Trust receipts are "a method of securing a debt and not of creating a debt" (*Commercial Discount Co.* v. *Los Angeles County* (1940), 16 Cal.2d 158, 161 [105 P.2d 115]); there can be no such thing as a security interest which secures no obligation. If *Oil City Motor Co.* v. *C.I.T. Corp.* (1935), 76 F.2d 589 [104 A.L.R. 240], purports to stand for the proposition that trust receipt transactions cannot be loans within the usury laws, then we cannot agree with it. As we understand the Oil City case, however, it is based upon the rule, not applicable here, that (p. 591 of 76 F.2d) "A return demanded and received for a

---

understood and agreed that the defendants were to finance the plaintiff in his business . . ., that . . . said agreement was to be carried out; that in carrying out the same the plaintiff made contact with several manufacturers in Los Angeles, who understood plaintiff was to be financed and that later the parties signed the agreements herein admitted in evidence and captioned 'trust receipts'; that in carrying out their understanding the plaintiff did in all cases but three or four, (in which three or four cases the money was sent by plaintiff [should read "defendants"] to the manufacturers) proceed to Los Angeles with his truck, or some truck under his control; that he did then order and secure delivery of various articles, from said manufacturers load the same on the trucks; and at the same time secure the invoices to the goods; that the trucks did deliver to his store at Sacramento; that he did at once take the invoices over to the defendants, and did present the same to defendants, and that the parties did then and there sign a document such as admitted in evidence and designated trust receipt; that in that document there was a description and price of articles listed therein; that defendants did immediately give to the plaintiff a check to cover the amount thereof; that it was understood and agreed by the parties that they were, and it was the intent of each, that a trust receipt transaction was contemplated; and if you further find that the goods were placed in plaintiff's store, and that both parties so acted that thereby the goods were 'floored,' and that both recognized that plaintiff was trustee as elsewhere described herein and did not have title thereto to dispose of the same, except under the terms of the trust receipt and that defendants as entrusters had a security interest, and each party understood and agreed that the interest of the plaintiff was that of a trustee, as referred to elsewhere herein, and in the trust agreement; that when plaintiff delivered the invoices to defendants and received a check in payment thereof both he, as trustee and defendants as entrusters intended that a security interest should thereby pass to entrusters and the check so given or money represented thereby was to be applied in payment to the manufacturers as per said bill of goods, and both parties then and there signed the various documents labeled trust receipts; that there was no understanding or agreement express or implied, other than the above, if you so find the facts to be, then I instruct you that it would be your duty to find that the transactions as between the parties were trust receipt transactions and not loans."

bona fide loan or extension of credit as distinguished from a loan of money does not taint the transaction with usury regardless of the amount . . . if the transaction is in good faith and not a mere . . . device to conceal usury.''

We pass over the question as to whether plaintiff should be foreclosed, because, it may be argued, he induced the erroneous view, from raising the contention that the giving of the instructions quoted in footnote 9 was error, and we consider the contention on its merits. ██ We recognize that such instructions are clearly erroneous to the extent that they imply that trust receipt transactions and loans are, respectively, inherently and necessarily exclusive each of the other, and to the extent that they advised the jury that ''If the transactions . . . were trust receipt transactions and not loans, then the question of interest is not involved''; nevertheless, if all the instructions are read together, in the light of the evidence, it appears that the error could not reasonably, and plaintiff upon whom as appellant the burden rests has not shown that it did, result in a miscarriage of justice. It is obvious that in fact and in law loans were made, else there would have been no obligations for the trust receipts to secure, and it is equally obvious that documents in the form of trust receipts were used to evidence a security interest which, if the transactions were bona fide, was created.

The error in the instructions quoted at length in footnote 9 lies in the statement that ''If the transactions . . . were trust receipt transactions and not loans, then the question of interest is not involved, and under such circumstances there can be no claim of usurious or unlawful interest''; in the statement that ''In determining whether the transactions were loans or whether they were under trust receipts, you must,'' etc.; and in the statement that ''It is necessary for you to determine whether the transactions were loans or were trust receipt transactions.'' But in the lengthy substance of the instructions in question, after the opening paragraphs, the court implicitly predicates applicability of such instructions upon the condition ''If you find as follows:'' and then details facts which must be found if the subject instructions are to be given effect. Such facts all go to the question of good faith and substantiality in the use of the trust receipts, not to conceal a device for securing usurious interest, but to evidence a security interest in, and exclusively in, a bona fide flooring transaction in which legitimate charges other than for interest could be made. To this effect such instructions

particularly specified as conditions (which must have been found to exist before the instructions would have been applicable) that it was agreed ''that the defendants were to finance the plaintiff in his business'' (not merely to loan money for interest to a going concern with established business and credit) ; that the furniture was actually bought from ''several manufacturers in Los Angeles, who understood plaintiff was to be financed''; that the furniture so purchased was placed in plaintiff's store; that plaintiff ''did at once take the invoices over to the defendants . . . and that the parties did then and there sign a document . . . designated trust receipt; . . . that defendants did immediately give to the plaintiff a check to cover the amount thereof; that it was understood and agreed by the parties that they were, and it was the intent of each, that a trust receipt transaction was contemplated; and if you further find that the goods were placed in plaintiff's store, and that both parties so acted that thereby the goods were 'floored,' and that both recognized that plaintiff was trustee . . . and did not have title thereto to dispose of the same, except under the terms of the trust receipt and that defendants as entrusters had a security interest, and each party understood and agreed that the interest of the plaintiff was that of a trustee, as referred to . . . in the trust agreement; . . . *that there was no understanding or agreement express or implied, other than the above, if you so find the facts to be, then I instruct you* that it would be your duty to find that the transactions as between the parties were trust receipt transactions and not loans.'' (Italics added.) Obviously it was error to give an instruction, standing alone, that if the transactions were trust receipt transactions they were not loans, but it is also obvious that applicability of that instruction was conditioned on the jury's finding that the trust receipt transactions were bona fide and to secure flooring of the furniture and not to conceal or secure any hidden agreement for the mere payment of interest.

Furthermore, the erroneous statements are to be considered in the light of other instructions given, hereinafter quoted. The jury were told that they must consider the instructions as a whole. So considered, the instructions make it clear that the ultimate issue actually to be decided was not whether the transactions were trust receipts or loans; that it was whether the loans, or the transactions by whatever name they might be called, were or were not usurious. The

jury were told what a loan is[10] and under the undisputed evidence, as already indicated, it would seem that they must have found that there were loans here. Trust receipts were partially explained to them, by quotations from the Uniform Trust Receipts Law, in such a manner that, in the light of the evidence, it would seem that they must have found, as likewise already indicated, that there were trust receipts here. Moreover, the jury were told to look to all the circumstances in determining whether there was a usurious charge of interest.

Following are the instructions to this effect which were given at plaintiff's request: "A contract or agreement involving a loan of money may be verbal or in writing, and the promise or obligation to repay or return the money may be secured or unsecured. The form of instrument by which a borrower hypothecates or puts up property to secure the repayment of the money borrowed does not in and of itself change what is in fact a loan of money into something else. Such instrument may be in form a mortgage contract, a pledge contract, *a trust receipt contract* [italics added] or any one of a number of other writings made to secure the obligation, and you are instructed that if from all the circumstances surrounding the transactions occurring between plaintiff and defendants you find that the transactions were in fact loans of money, then any such instrument or instruments purporting to transfer an interest in property solely for the purpose of securing repayment of the money borrowed does not change what in fact was a loan of money into some other form of obligation. In other words, once a loan of money is made, any instrument executed or given to secure repayment of that loan of money does not change or destroy the fact that a loan of money was made in the original instance."

"The intent with which the usury is committed is immaterial, for the voluntary taking of more than the legal rate of interest constitutes usury. Therefore the only intent necessary on the part of the lender is the intent to take more interest than the law permits. Usurious intent is implied if excessive interest is intentionally taken, and it is of no consequence that there was no specific intent knowingly to violate the usury law.

---

[10]The following instruction was given: "A loan of money is the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use." This definition is materially similar to the definition in the Civil Code (§ 1912).

"However where different transactions have been entered into and these different transactions are relied upon in making a charge of usury all the circumstances must be inquired into to determine whether or not such collateral agreement, or separate agreement was intended to be and was a part of another agreement, and considering the two together there was a usurious charge of interest. . . . Under such circumstances the question is whether there was an intent to evade the law with regard to usury, and all the circumstances may be considered in the determination of such question. The burden rests upon the one charging usury to establish such charge."

In the light of these instructions it would be attributing to the jury folly, or disregard of the charge to consider the instructions as a whole, to assume that they thought that the lengthy trial was had in order to determine whether the relationship of plaintiff and the finance company was that of borrower and lender or that of trustee and entruster (when it was undisputably both), rather than to determine whether the loans secured by the trust receipts were usurious. It is clear—or at the very least plaintiff has failed to sustain the burden of showing convincing evidence to the contrary—that the jury rejected plaintiff's contention that the finance company charged usurious interest because it is apparent from plaintiff's testimony as a whole that he first conceived the notion that the transactions were illegal when he decided upon this action as a method of recouping his failing fortunes[11] after he defaulted on a payment due to the finance company.

Plaintiff also complains of the giving of the following instruction: "A lender is not prohibited from charging an extra and reasonable amount for incidental services, expenses or risk additional to the lawful interest, other than for the loan of money. He may make a reasonable charge for investigating, arranging, negotiating, brokering, making, servicing, collecting and enforcing his obligation.

"Such items, however, must be confined to specific service or expense incidental to the loan incurred in such a way as

---

[11] A statement covering plaintiff's business during the period from July 7, 1946, to December 27, 1946 (on the latter date, as hereinafter described, defendants took possession of the furniture because of plaintiff's default in payments), shows "liabilities owing" in the amount of $21,829.67; under assets, "cash on hand in bank was a minus $39.85," and "Mr. Klett's capital was a deficit, $2,712.26."

to preclude it being a device through which additional interest or profit on the loan may be exacted."

This instruction, given at defendants' request, is a correct statement of the law (*In re Fuller* (1940), 15 Cal.2d 425, 433, 434 [102 P.2d 321]; see *Haines* v. *Commercial Mortgage Co.* (1927), 200 Cal. 609, 616 [254 P. 956, 255 P. 805, 53 A.L.R. 725], pointing out that a general charge for "expenses" or "services" not attributable to any particular expense or service may well be but a device to evade the usury law). Plaintiff asserts that the instruction conflicts with the provision of section 22 of article XX of the California Constitution that "No person . . . or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than ten per cent per annum upon any loan or forbearance of any money . . ." ██ Legitimate charges for specific items of actual service and expense are not, as plaintiff seems to believe, compensation for the *loan* of money; i. e., such charges are not interest; and the statement in *Carter* v. *Seaboard Finance Co.* (1949), 33 Cal.2d 564, 579 [203 P.2d 758], that the quoted constitutional provision was intended "to prevent lenders from circumventing the limits on interest . . . by forbidding any charges whereby the borrower is required to pay more than the 10 per cent," does not mean that charges which are not interest become interest by reason of the constitutional amendment.

██ There was received in evidence, over plaintiff's objection, the statement of trust receipt financing which, under section 3016.9 of the Civil Code, may be filed by an entruster with the Secretary of State. The statement was merely some evidence that the finance company intended to lend money to plaintiff on the security of trust receipts. Its admission could not have prejudiced plaintiff. He, himself, proved the fact.

### The Conversion Cause of Action

On December 16, 1946, after defendants had been financing plaintiff under the "trust receipt" arrangement for about a year, plaintiff issued to defendants his check for the amount due under one of the "trust receipts" which covered furniture which had been sold by plaintiff to a retail customer. The check was not honored because there were insufficient funds in plaintiff's bank account. Also at this time plaintiff, in violation of the terms of "trust receipts," had not turned over to defendants the proceeds of sales of certain other furniture which was covered by such "trust receipts." The due dates on the other "trust receipts" covering the furniture in plain-

tiff's store had passed. After the check was dishonored defendant Forrest made several oral demands that plaintiff make good the check, and that he pay the entire amount due to the finance company (about $7,030) or surrender possession of the entrusted furniture. Plaintiff stated that he had no money with which to pay the finance company. On December 27, 1946, Forrest, as he had told plaintiff he would do, came to plaintiff's store and took all the furniture which was covered by "trust receipts"; Forrest also took other furniture, not covered by "trust receipts," of a value equal to that of the furniture which plaintiff had improperly sold without delivering the proceeds.

The complaint on which the case was tried alleges that defendants on December 27, 1946, converted, took, and carried away the furniture; that plaintiff thereafter demanded and defendants refused return of such furniture; and, upon information and belief, that defendants subsequently sold the furniture.

The jury, adequately instructed,[12] impliedly found upon sufficient evidence[13] that plaintiff consented to the taking of the furniture on December 27. ▇▇ Since plaintiff consented to the taking of the furniture, that taking was not a conversion, and the following contentions of plaintiff (together with related contentions concerning the instructions) are

---

[12] The jury were told that "in a legal sense the word 'consent' means capable, deliberate, free and voluntary assent or agreement to, or concurrence in, some act or purpose, implying physical and mutual power and free action which is unclouded by threats, or duress. It presupposes that the person to be affected has knowledge of his rights. If, therefore, consent is given or obtained by means of unwarranted threats, or is given by a person without full knowledge of his rights, such a consent has no force or effect whatsoever, and the legal effect of consent given under such circumstances is the same as though no consent were given"; that "he who consents to an act is not wronged by it"; and that "If you believe that when the defendants called upon plaintiff to surrender the merchandise which was then in plaintiff's possession, the plaintiff did not dispute defendants' right to the goods, or set up a claim to them against the defendants, but freely consented thereto, then the defendants committed no conversion."

[13] After Forrest had demanded that plaintiff pay the amount due the finance company or surrender the furniture, and plaintiff had told Forrest that he could not pay, Forrest told plaintiff that on the morning of the 27th he (Forrest) would come to plaintiff's store to take the furniture. On that morning plaintiff went to the store with Forrest. Plaintiff told an employe that Forrest "has come for the furniture and is going to take it out of the store and we are going to turn it over to him," and directed the employe to turn over to Forrest certain furniture not covered by "trust receipts" in place of furniture which plaintiff had improperly sold without delivering the proceeds of the sales to

without merit: that Forrest improperly took some furniture which plaintiff had already sold to retail purchasers; that plaintiff was not in default (because of a waiver of default) and therefore defendants could not sell the furniture without notice to plaintiff; that because defendants were not licensed under the Personal Property Brokers Act (Stats. 1909, p. 969, as amended; 2 Deering's Gen. Laws, Act 5825 (2d)[14]) the loans were void (§ 21) and therefore the sale of the furniture in which the finance company had only a purported security interest amounted to a conversion.

Furthermore, the Personal Property Brokers Act had no application. The act did not apply to "bona fide conditional contracts of sale involving the disposition of personal property, when such forms of sales agreements are not used for the purpose of evading this act" (§ 4, par. (c)), and "As used in this act the term 'conditional contracts of sale' shall include flooring contracts" (§ 3). The security transactions here, although not conditional sales contracts in the usual sense of the term, are "flooring contracts" within the meaning of the act and within the definition of "flooring contracts" accepted by plaintiff; hence they are included within the definition (§ 3 of the act) of conditional contracts of sale. (See plaintiff's instruction quoted *supra,* footnote 1; *Commercial Credit Co.* v. *Barney M. Co.* (1938), 10 Cal.2d 718, 720 [76 P.2d 1181].)

Plaintiff complains that an objection to the following question addressed to him was sustained: "Now, assuming he [Forrest] did not have a right to remove that furniture, would you have consented to his taking any of the furniture?" Framed as it was, the question required plaintiff to speculate on what his action would have been. If plaintiff wished to adduce testimony as to his state of mind he could have testified to it directly rather than speculatively.

Certain evidence offered by plaintiff to prove the extent of his damages was rejected. Since the jury found against plaintiff on the issue of liability and did not reach

defendants. At the time Forrest was taking the furniture plaintiff asked Forrest to hold it for him because plaintiff believed he might be able to raise some money; Forrest replied that he would hold it for five days; and plaintiff stated that that was satisfactory. Thereafter plaintiff did not communicate with defendants concerning the furniture. Defendants held it for more than five days and then, without notice to plaintiff, sold it for about $6,500 and applied this sum to the cancellation of plaintiff's debt; about $530 remained owing from plaintiff to the finance company.

[14]Provisions based upon this act are now found in the Financial Code, § 22000 et seq.

the issue of damages, plaintiff cannot now complain of the rejection of the evidence as to extent of damages.

 Finally, plaintiff asserts that the jury were out too short a time to have properly deliberated. They retired at 11:10 a.m. and returned 25 minutes later with a signed separate verdict on each of the two counts. The jury were polled and, with the exception of one juror as to count 2, the verdicts for defendants were unanimous. We cannot conclude from this circumstance, either standing alone or in the light of the entire record, that there is reasonable ground for concluding that there has been a miscarriage of justice; accordingly the verdicts must be upheld. (Cal. Const., art. VI, § 4½.)

For the reasons above stated the judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

Edmonds, J., concurred in the judgment.

CARTER, J.—I dissent.

The main issue presented in this case was whether the transaction between plaintiff and defendants was usurious. The transaction was in the form of trust receipts and the court erroneously instructed the jury, as is conceded by the majority opinion, that a trust receipt transaction can never be usurious and if it was found to be such an arrangement in this case, defendants must recover. Yet it is held that there was no prejudice—that the jury was not misled. I think it is clear that the majority opinion itself demonstrates that the jury was misled. The parties and the trial court were confused as to the law on the subject and hence the erroneous instructions were given. How then may it be said the jury was not confused?

Turning to the law involved, it appeared that the trust receipt instruments were between plaintiff-dealer, as trustee, and the company-financier, as entruster, and provided that the trustee "holds in trust" for the entruster, "as security for payment of the amount hereinafter set forth on the due date hereinafter specified," the described furniture, "in which personal property a security interest remains in or is hereby transferred to Entruster as security for such payment. Trustee agrees to hold said personal property in trust as the property of Entruster for the purpose of sale or exchange and to deliver same to the Entruster upon demand. Entruster may

at any time examine said personal property and the books and records of the Trustee with reference thereto and may at any time either before or after the due date repossess said personal property without notice or demand of any kind and for such purpose Entruster or his representatives may without legal process enter any premises in which said personal property is located. Entruster may insure said personal property against the hazards of fire and theft while held by the Trustee for not less than the amount secured hereby, and the Trustee agrees to pay the premiums and charges for such insurance to Entruster upon demand and until so paid same shall likewise be secured hereby.

". . . The Trustee may, however, sell said personal property for cash or on terms approved in advance by Entruster for not less than the amount due Entruster hereunder, including insurance premiums and charges; provided, however, that upon such sale all moneys hereby secured shall become immediately due and payable and all of the proceeds and considerations received in such sale shall be forthwith delivered to Entruster as security for payment of said moneys and until so delivered shall be held by the Trustee separate from the funds of the Trustee and as security for such payment." The articles of furniture are described and an amount named "Amt. Secured" is set opposite each, together with the due date. On repossession of the property by the entruster it may sell it and apply the proceeds to the expenses of the sale and "to the satisfaction of the Trustee's indebtedness hereby secured; and, fourth, to the payment of any other obligation owed by Trustee to Entruster. The Trustee shall receive any surplus and shall pay into Entruster upon demand any deficiency. . . .

"In the event of default by the Trustee in the payment of any moneys hereunder due on the due date hereof, Entruster may declare all moneys secured immediately due and payable. In event of such default Entruster may at his option and in lieu of sale as hereinabove provided declare a forfeiture of the Trustee's interest in said personal property against cancellation of the then remaining indebtedness in accordance with the provisions of Section 3016.2 of the Civil Code of the State of California."

It is quite clear that the transactions were standard trust receipt arrangements as they are established by the Uniform Trust Receipts Law. (Civ. Code, §§ 3012-3016.16.) That law defines an entruster as one who has directly or by agent

taken a "security interest" in goods under a trust receipt transaction, but does not include a person who owns goods and sells them on conditional sale for profit. (Civ. Code, § 3013 [3].) A "security interest" is a property interest in goods limited "to securing performance of some obligation of the trustee." (*Id.*, § 3013[12].) A "trustee" is a person "having or taking" possession of goods under a trust receipt transaction. (*Id.*, § 3013[14].) "New value," includes new "advances or loans" made, but not extensions or renewals of existing obligations of the trustee. (*Id.*, § 3013[7].) A trust receipt transaction is any transaction where the entruster and trustee are parties for one of the purposes mentioned in the section (that is, applicable here, where the possession of the goods by the trustee is for the purpose of selling them [*Id.*, § 3014(1)(3)(a)]), whereby "(a) The entruster or any third person delivers to the trustee goods . . . in which the entruster (i) prior to the transaction has, or for new value (ii) *by the transaction acquires* or (iii) as the result thereof *is to acquire promptly,* a security interest . . . provided, that the delivery under paragraph (a) . . . either (i) Be against the signing and delivery by the trustee of a writing designating the goods . . . concerned, and reciting that a security interest therein remains in or will remain in, or has passed to or will pass to, the entruster. . . ." (*Id.*, § 3014[1][a][b][i].) The security interest of the entruster may be derived from the trustee or from any other person. (*Id.*, § 3014[1].) Under the initial oral agreement here, the method by which the transactions were handled, we have at least a situation where the purpose of the arrangement was to enable plaintiff-trustee to have possession of the goods for retail sale; defendant company-entruster acquired its security interest from the plaintiff-trustee; the goods were delivered to the trustee by a third person, the factory-seller and the entruster "by the transaction is to acquire promptly" a security interest. The trust receipts declaring the security interest in the entruster were executed immediately after the trustee obtained possession of the goods from the seller in conformity with the prior oral understanding. The entruster gave new value, that is, the payment of 90 per cent of the cost of the goods. We do not read the uniform law as requiring that title pass to the entruster from the seller-factory, that is, that a tripartite arrangement is required between the seller, retail dealer and financier. As long as it is a part of the same transaction, and the steps are in close proximity, we have a trust receipt.

Here the advancements were made to enable the dealer-trustee to buy from the seller and the advances were to be secured by trust receipts. All according to an oral understanding, and promptly upon delivery of the goods by the seller to the trustee, the advancements were made, the seller was paid, and a trust receipt executed which vested a security interest in the entruster. It is true that a trust receipt under the uniform law is not a negotiable promissory note, for it is not an unconditional promise to pay a sum certain. It is a method of ''securing a debt and not creating a debt.'' Nor is it a chattel mortgage or conditional sale. (*Commercial Discount Co.* v. *Los Angeles County,* 16 Cal.2d 158 [105 P.2d 115]; *Chichester* v. *Commercial Credit Co.,* 37 Cal.App.2d 439 [99 P.2d 1083].) Nevertheless, the transaction is a security transaction. As said in *Commercial Discount Co.* v. *Los Angeles County, supra,* 16 Cal.2d 158, 161, after stating that a trust receipt is a method of securing a ''debt'' not creating a ''debt'': ''There is nothing in the law which would prevent the execution of a promissory note or notes representing the amounts secured by the trust receipts. It does not appear that the plaintiff took notes from the automobile dealers for that purpose and the case is presented on the theory that the obligations to repay the money loaned rested in parol.'' In *Chichester* v. *Commercial Credit Co., supra,* 37 Cal.App.2d 439, the order for cars was placed by the retail dealer with the factory-seller and the financier paid the seller for them and they were shipped, the bills of lading going to the financier who turned them over to the dealer on his signing a trust receipt and he then got possession of them. While that was a tripartite transaction, the court said (p. 443): ''Prior to the adoption of the Uniform Trust Receipts Law, the only instance where the security title of a trust receipt holder was permitted to prevail against the claims of creditors of the trustee or against his trustee in bankruptcy, was where the title of the entruster or trust receipt holder was derived from someone other than the trustee. (*Arena* v. *Bank of Italy,* 194 Cal. 195 [228 P. 441]; *In re James, Inc., supra* [30 F.2d 555]; *In re Fountain,* 282 F. 816 [25 A.L.R. 319].) Where the title of the entruster was derived from the trustee and not from some third person, the transaction was treated as being similar to a chattel mortgage and was held to be void as against creditors of the trustee in the absence of recordation . (*Arena* v. *Bank of Italy, supra.*)

''If in the instant case defendant held the title to the automobiles at all times, as was found by the court, deriving

such title directly from the Chrysler Corporation, its security interest would be protected under the former law as well as under section 3016.4 of the Civil Code. The evidence discloses with respect to the Chrysler automobiles that although they were shipped by the Chrysler Corporation directly to Reagan, accompanied by invoices made out to Reagan, the bills of lading were made out to, and were sent directly to defendant. The evidence is conflicting as to whether sight drafts were attached to all of such bills of lading, but it appears without controversy that in every instance, whether by paying such drafts, or by other arrangements, defendant paid the full purchase price for such automobiles directly to the Chrysler Corporation. Moreover, defendant paid all of the freight charges. The bills of lading were not delivered to Reagan until after the trust receipts had been signed. Concerning the Plymouth automobiles which were delivered from the Los Angeles office of the Chrysler Corporation, defendant after securing trust receipts from Reagan, ordered the cars to be delivered to Reagan's place of business and paid the purchase price directly to the corporation. There is no evidence whatever tending to prove that Reagan at any time prior to signing the trust receipts, had either title to or possession of any of the automobiles in question. Although the trial court found that defendant was at all times the owner of the automobiles in question, *it was of no consequence whether defendant's title originated with the Chrysler Corporation or with Reagan.*

"Plaintiff places great reliance upon the case of *Arena* v. *Bank of Italy, supra,* in support of his contention that a trust receipt which does not comply with the provisions of section 3440 of the Civil Code is void as against creditors of the trustee. That decision, however, is clearly distinguishable upon its facts from the instant case. It must be borne in mind that the Arena case was decided long prior to the enactment of the Uniform Trust Receipts Law. In the Arena case, one Dellaira having both the title and possession of certain goods, assigned and delivered possession of such goods to the Bank of Italy as security for an indebtedness; thereafter the bank restored the possession of such goods to Dellaira and, at the same time took the trust receipts in question from Dellaira. Obviously, whatever title or interest the bank acquired could only have been derived from Dellaira, the trustee under the trust receipts. The court properly held that under the *law which existed at that time,* i.e., prior to the enactment of the Uniform Trust Receipts Law, the trans-

action was to be treated as being in the nature of a chattel mortgage and consequently void as against the trustee's (debtor's) creditors unless properly recorded.

"From the foregoing discussion it appears that under the former law the source of the entruster's title was the controlling factor in determining whether or not a given trust receipt transaction was valid. However, under the existing law, by which the instant case is to be governed, the entruster's security interest will be protected whether his title is derived from the trustee or from a third party. From an examination of section 3014 of the Civil Code, which defines trust receipt transactions, it is apparent that the legislature intended to include within the general provisions of the law all trust receipt transactions without regard to the source of the entruster's title. *That section provides, among other things: 'The security interest of the entruster may be derived from the trustee or from any other person, and by pledge or by transfer of title or otherwise.'*

"The only case which has come to our attention, involving an interpretation of the California Uniform Trust Receipts Law, is *In re Boswell,* 20 F.Supp. 748, affirmed in 96 F.2d 239. The facts of that case were similar to those of the Arena case in that the entruster derived its title from the trustee who had both possession and title to the merchandise covered by the trust receipt. Thereafter the trustee became bankrupt and action was brought by the entruster to reclaim the merchandise from the trustee in bankruptcy. It was held that under the sections of the Civil Code comprising the Uniform Trust Receipts Law, such a transaction was valid and enforceable and that the entruster was entitled to reclaim the merchandise in question from the trustee in bankruptcy." *In re Boswell,* 20 F.Supp. 748, affirmed 96 F.2d 239, approved in the Chichester case, involved a situation where the retail dealer bought the merchandise on open account from the seller-factory and title passed to him and the bank-financier advanced $800 to pay for it and took notes representing the amount and a trust receipt as security. In *In re Chappell,* 77 F.Supp. 573, 575, it is said: "In order to constitute a trust receipt transaction under the Oregon Uniform Trust Receipts Law the entruster bank must acquire its security interest prior to or at the same time as delivery is made to the dealer, or delivery must be made under some arrangement whereby the security interest is to be acquired 'promptly.' Section 75-102, O.C.L.A. In other words, the delivery of the

goods to the dealer must stem from an arrangement between the bank and the dealer for the acquisition of the goods by means of advances from the bank.'' (See, also, *Automobile Banking Corp.* v. *Weicht,* 160 Pa. Super. 422 [51 A.2d 409]; *Peoples Finance & Thrift Co.* v. *Bowman,* 58 Cal.App.2d 729 [137 P.2d 729]; *Universal Credit Co.* v. *Citizens State Bank of Petersburg,* 224 Ind. 1 [64 N.E.2d 28, 168 A.L.R. 352]; 57 Yale L.J., 761; 5 Fordham L.Rev., 17, 240; 16 Wash. L.Rev. 1, 10; 41 Colo.L.Rev., 1134; 3 Univ. of Chicago L.Rev., 26.) Plaintiff seeks to distinguish the Chichester case on the ground that there was at the time that case arose a subdivision (c) to subdivision (1) of section 3014, which read: ''. . . or (c) the entruster gives new value in reliance upon the transfer by the trustee to such entruster of a security interest in goods or documents in possession of the trustee and the possession of which is retained by the trustee . . .'' which subdivision was later eliminated by amendment (Stats. 1939, p. 2826), and a special provision was added for the protection of motor vehicle and aircraft dealers, reading: ''A trust receipt transaction is also one in which, pursuant to a trust receipt, a motor vehicle dealer or aircraft dealer as trustee obtains new value from an entruster upon the transfer to the latter of a security interest in new or used motor vehicles or aircraft, whether or not such vehicles or aircraft are owned or possessed by the trustee prior or subsequent to the execution of the trust receipt document, and whether or not such vehicles or aircraft are thereafter retained in the trustee's possession.

''All of the provisions of this chapter which are applicable to the trust receipt transactions enumerated in Section 3014 are applicable to the trust receipt transaction specified in this section.'' (Civ. Code, § 3014.5.) But the Chichester case was not based on said subdivision (c) as seen from the quotation therefrom, *supra.* The transaction here concerned, falls within subdivision (a) of subdivision (1) and the next to last paragraph in subdivision (1). The special provision for motor vehicles and aircraft deals with cases where the dealer has possession of the goods prior to and wholly independent of the trust receipt. There is no relation between his possession and the trust receipt. Here the whole thing was a part of a continuous transaction.

As plaintiff's first cause of action is for allegedly usurious interest, defendants urge that there could be no such interest for the reason that ''trust receipts'' are not subject to the usury law (Cal. Const., art. XX, § 22; Stats. 1919, p. lxxxiii),

as they are not a loan or forbearance of money. We find nothing in the trust receipts law that exempts such transactions from the usury law. As above seen they are a *sui generis* type of *security* transaction, somewhat like a chattel mortgage, pledge or conditional sales contract, but different from any of them. The fact remains that the transaction is a method by which the performance of some financial obligation is *secured,* the same as is true of other security arrangements such as chattel mortgages. Being only the security instrument, like a chattel mortgage, accurately speaking, it is not the *loaning* instrument—or one containing the promise to pay or do some other act. Such features are usually found in promissory notes or collateral promises to perform. In trust receipts the main purpose is to assure the entruster that he will be repaid the money advancements he has made to enable the trustee-dealer to obtain possession of and sell merchandise. He may be in the position of a lender to the dealer-borrower. The obligation or promise for which the trust receipt is given, must be examined to determine whether there has been a loan or forbearance and whether the interest is too high. In *Oil City Motor Co.* v. *C. I. T. Corp.,* 76 F.2d 589 [104 A.L.R. 240], the finance company paid the price of the cars to the seller and they were then shipped to the dealer and the latter gave a trust receipt to the company, thus enabling the dealer to obtain the cars with the instruments of title. If that case purports to stand for the proposition that such transactions may never be loans within the usury laws, we cannot agree with it. It is based upon the proposition that a sale or loan of credit is not a loan of money and therefore not within the usury law, a principle which is subject to the qualification that such a device may not be used as a cloak for usury. It has been said: ''It is well settled that the usury law is inapplicable to a transaction amounting merely to a loan or sale of credit, and a loan of money, to facilitate which a loan of credit is made, is not rendered usurious by the payment of, or agreement to pay, a sum exacted for the loan of the credit. However, it is difficult to lay down any general rule as to what amounts to a sale of credit as distinguished from a loan. Although the transaction must not be a mere cover for usury, and in the decision of this question the intent of the parties is important, generally speaking, consideration must be given to the particular facts in order to determine whether one of the parties to the transaction is to advance money, or whether the advance is

to be made in the first instance by a third party. If, for instance, the transaction is one not contemplating the immediate advance of money by a party thereto, but merely a means of enabling one of the parties to procure funds from a third party, it is properly deemed a sale of credit, as regards the usury statutes, although eventually the party permitting the use of his credit has to advance the money before he is placed in funds or property by the one receiving the credit.'' (55 Am.Jur., Usury, § 25.) The most common and clear instance of its application is where a person guarantees payment by the maker of a promissory note. (See 104 A.L.R. 245.) Where, however, as a part of the transaction, the lender in fact advances the money to purchase the merchandise for the dealer, with an express or implied promise to repay the money, together with what qualifies as interest under the usury law, there may be a loan of money. (See *Osborne* v. *Fuller*, 92 S.C. 338 [75 S.E. 557, 42 L.R.A.N.S. 1058] ; *Wood* v. *Angeles Mesa Land Co.*, 120 Cal.App. 313 [7 P.2d 748].) An issue to be determined, therefore, is whether the basic transaction constituted a loan or forbearance within the meaning of the usury law.

The majority opinion says that the case is not a close one; that the instructions permitted the jury to find the transactions were trust receipts and yet loans, for it could find that the trust receipts were bona fide and to secure *flooring* of the furniture and not an agreement for interest, that is, in effect, that if they were *flooring* contracts, there was no usury. Not only is that not true but the majority concedes it is not, later in the opinion, where it is said: ''The security transactions *here*, although not conditional sales contracts in the usual sense of the term, are '*flooring contracts*' within the meaning of the act and within the definition of 'flooring contracts' accepted by plaintiff.'' But, obviously, flooring contracts are the same as trust receipts. The ultimate holding is therefore that flooring contracts—trust receipts—are not subject to the usury laws.

As I have pointed out, the case was a close one. Indeed the evidence is overwhelming that the transactions were *loans* for which *interest* was charged which exceeded the legal limit. There is evidence from which it may be inferred that the transaction was a loan of money rather than a loan or sale of credit, or any other transaction, such as the actual advance of the money to either plaintiff or the manufacturer, carrying with it an implied promise to repay together with

1 per cent per month. The trust receipt refers to an "indebtedness" for which it stands as security; that a "security interest" is transferred to the entruster-defendant, thus negating a sale of the property. In some of defendants' accounts the 1 per cent item has the letters "*Int.*" after them, indicating *interest*. Defendants are in the lending and financing business, not the retail furniture business. Defendants' explanation of the arrangement with plaintiff is weak and conclusionary, barely sufficient to create a conflict in the evidence. Kenneth Forrest, one of the officials, testified that it was for trust receipts and plaintiff Klett "asked me or rather told me he had been in the furniture business for approximately thirty years; that he understood it very thoroughly; he was forming a partnership with a Mr. Raymond Parker and Mr. Parker was going to put up $7500.00 and he was going to put up his ability and they were going to start a furniture store on the Davis Highway and Mr. Parker at that time had not put up all his money and he had only put up, if I remember correctly, around $2000.00 or $2500.00 and that he would like to find some way to have furniture placed in his store and asked me if I would be able *to do his financing* for him and I told him it was impossible for me to finance any furniture because it did not have a serial number on it, that if he would like to floor his merchandise such as appliances that I would be glad to do it for him and he told me that I had known him for considerable time and he would be glad to place a serial number on each individual piece of furniture and under those circumstances would I floor merchandise for him and I told him, after some conversation back and forth regarding his experience, I told him I would do it and I told him when I would be able to do it under trust receipts, that I would send the checks direct to the factory on each particular deal and that he would put up 10 per cent and *I would charge him 1 per cent a month* and at that time he stated he had some furniture in Sacramento already, I asked him, is it paid for and he said it was and I told him that we would purchase the furniture in Sacramento on trust receipts and pay him 90 per cent of that and charge him 1 per cent of that also . . . and, about that time, he asked me if I would also handle his contracts and I told him that I would be glad to purchase his contracts but that I would have to buy them non-recourse as we *didn't have a loan license* and it would be necessary that we buy the contracts non-recourse and that our charge for purchasing them was approximately 17 per cent and he said that was perfectly

satisfactory, that he would be glad to do business with us on that basis . . . Mr. Klett asked me if I would be able to *finance* about $5,000 and I told him that we would, in fact, we stipulated at that time we wouldn't go over $5,000.'' In regard to the 1 per cent per month charge, Forrest testified: ''Q. What was that 1 per cent for, Mr. Forrest? A. The charge of enabling him to have our furniture in his store and other consideration. Q. Would that be for, let us say, writing up the trust receipt and handling the invoice and such as that? A. Yes, sir, that would include writing up the trust receipt, the bookkeeper's time, making up a ledger card and putting it in the books and making up the addressograph plate to enable us to send the notices, and the notices themselves and the mail. . . . Q. And *for the use of that money you made a charge of 1 per cent,* is that correct? A. For the privilege of his having my furniture in his store I charged him 1 per cent a month. Q. *For the privilege of his having your furniture in his store you charged him 1 per cent a month.* A. *That is right.* Q. And is that 1 per cent—considerable of that 1 per cent, as you have testified, went into certain expenses? A. That is right. Q. Do you know how much of the 1 per cent went into actual expenses? A. Roughly, I would say about ½ of 1 per cent. Q. That is about half of it? A. The other half, I would say, was profit.'' In other words the deal was to be by trust receipts and was to enable plaintiff to have furniture in his store—to finance him—to loan him money.

It will be noted that frequent references are made to trust receipts. Both parties agreed that instruments called trust receipts were used. A notice that they were engaged in trust receipt transactions was filed with the Secretary of State as required by law. (Civ. Code, § 3016.9.) The trust receipts, labelled by that name, were introduced into evidence. *With everything pointing to a trust receipt arrangement and nothing to the contrary, the jury was told that if it was a trust receipt deal there was no usury—defendant could not recover.* I fail to see how the jury could escape being misled to the prejudice of plaintiff. The parties and the evidence told them the arrangement was a trust receipt one and then as a clincher the court commanded them to hold for defendants if trust receipts were used. This court said in *Sebrell* v. *Los Angeles Ry. Corp.,* 31 Cal.2d 813, 817 [192 P.2d 898]: ''Instructions that are contradictory in essential elements may

warrant the reversal of a judgment on the ground that it cannot be ascertained which instruction was followed by the jury.''

I would therefore reverse the judgment.

Appellant's petition for a rehearing was denied May 15, 1952. Carter, J., was of the opinion that the petition should be granted.